## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

R.B.,

Plaintiff,

v.

LISA HOLLIBAUGH, et al.,

Defendants.

CIVIL ACTION NO. 1:16-CV-01075

(KANE, J.)
(MEHALCHICK, M.J.)

## REPORT AND RECOMMENDATION

On June 6, 2016, Plaintiff R.B., appearing through counsel, initiated this civil rights action seeking money damages as well as injunctive and declaratory relief by filing a fee-paid complaint. (Doc. 1). In his fifteen-count complaint, Plaintiff asserts claims under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-34, the Rehabilitation Act ("RA"), 29 U.S.C. §§ 791-94g, and state law. Plaintiff's complaint names as Defendants the Pennsylvania Department of Corrections ("DOC"), an agency of the Commonwealth of Pennsylvania, as well as the following individuals: SCI-Smithfield staff members Assistant to the Superintendent Lisa Hollibaugh, Superintendent Jon D. Fisher, Deputy Superintendent Jay Whitesel, Corrections Officer ("CO") Oliver, CO Lear, CO Bard, and CO Abrashoff (collectively, the "SCI-Smithfield Defendants"); SCI-Smithfield medical personnel Nurse Ronald and Physician's Assistant ("PA") Gillmen; and SCI-Waymart staff members Superintendent Wayne Gavin, Assistant to the Superintendent Joseph J. Vinansky, CO Martin, CO Strasburger, CO James, CO Brodhead, and CO "Stoney" (collectively, the "SCI-Waymart Defendants"). (Doc. 1, ¶¶ 4-21). With the exception of Nurse Ronald and CO Stoney, all Defendants have entered their appearance in

this matter through counsel.[1]

Currently pending before the Court is a joint motion to dismiss filed by the DOC, the SCI-Smithfield Defendants, and the SCI-Waymart Defendants on August 3, 2016. (Doc. 12). The motion has been fully briefed and is now ripe for disposition. (Doc. 13; Doc. 18; Doc. 20)

## I.   BACKGROUND

The events that give rise to Plaintiff's complaint took place between June and September of 2014, while Plaintiff was incarcerated at SCI-Smithfield in Huntingdon County, Pennsylvania and then later at SCI-Waymart in Wayne County, Pennsylvania. (Doc. 1). Plaintiff is a male of Hispanic descent who filed the instant complaint after he was released from DOC custody on parole in May of 2016. (Doc. 1, ¶ 3).

While incarcerated at SCI-Smithfield, Plaintiff was known as a gang drop-out and therefore was granted administrative custody ("AC") status and housed in the Restricted Housing Unit ("RHU"), as SCI-Smithfield did not have a dedicated mental health housing unit. (Doc. 1, ¶¶ 22, 55). Plaintiff carried paperwork on him, a form DC-141, that denoted his housing status and prior gang affiliation. (Doc. 1, ¶¶ 22-23). Additionally, Plaintiff was on the mental health roster at SCI-Smithfield because he developed a mental disability during his incarceration. (Doc. 1, ¶¶ 3, 24).

On June 7, 2014, CO Lear ordered Plaintiff to share a cell with inmate Michael Holtzman, who was also on the mental health roster. (Doc. 1, ¶¶ 25-26). Holtzman had a

---

[1] Plaintiff now believes that Nurse Ronald and PA Gillmen are one and the same person, and so the Court accordingly recommends that the Clerk of Court remove Nurse Ronald from the caption of this action. (Doc. 28, at 2). Furthermore, the Court has granted Plaintiff additional time to properly identify and serve the CO known by the nickname "Stoney." (Doc. 29).

reputation for violence and threatened to attack Plaintiff because of his status as a gang drop-out. (Doc. 1, ¶¶ 25-26). Plaintiff protested the cell assignment, told Lear that Holtzman was going to attack him because of his gang status, and showed Lear the form DC-141. (Doc. 1, ¶ 26). Nevertheless, Lear ignored Plaintiff's pleas and told Plaintiff to either accept the cell assignment or be assessed a misconduct that would jeopardize Plaintiff's upcoming parole review. (Doc. 1, ¶ 27). Faced with this threat, Plaintiff obeyed the order and entered the cell with Holtzman. (Doc. 1, ¶ 27). Shortly thereafter, Plaintiff appealed for help from CO Abrashoff, who was supervising the RHU at the time, but Abrashoff refused to assign Plaintiff to a different cell. (Doc. 1, ¶ 28). Plaintiff alleges that both Lear and Abrashoff acted out of animus towards Plaintiff as a Latino and a person with mental illness, and furthermore that other inmates of Hispanic descent and/or with mental disabilities previously filed grievances against Lear and Abrashoff complaining of their hostile words and actions. (Doc. 1, ¶¶ 29-32).

Within hours of being placed in the cell, Holtzman attacked Plaintiff by holding a razor to his neck and forced Plaintiff to perform sexual acts on him. (Doc. 1, ¶ 33). The next day, the attacks continued with Holtzman raping Plaintiff, causing extensive bleeding and tearing tissues of Plaintiff's anus and genitals. (Doc. 1, ¶ 34). Throughout the rape, Holtzman verbally humiliated Plaintiff and threatened to kill him if he reported the assault. (Doc. 1, ¶¶ 35, 37). Furthermore, Holtzman extorted Plaintiff to send fifty dollars from his prison trust found account to a woman in Philadelphia, threatening to rape Plaintiff again if he did not comply. (Doc. 1, ¶ 35). Plaintiff requested the funds to be sent out on June 8, 2014 and the transaction was completed the next day. (Doc. 1, ¶ 36). On June 11, 2014, Plaintiff was moved to another cell, ending his four-day ordeal. (Doc. 1, ¶ 37).

After being placed in a new cell, Plaintiff sent a request slip to the prison security office on the morning of June 12, 2014, asking for an officer to come and take a report of the rape. (Doc. 1, ¶ 38). When no officer came, Plaintiff submitted a second request the following day. (Doc. 1, ¶ 39). Plaintiff submitted more requests for an officer to take a report and for medical assistance over the next several days, while he continued to bleed from his injuries and attempted to care for his wounds on his own. (Doc. 1, ¶¶ 40-41). Finally, on June 17, 2014, Plaintiff was able to get CO Bard to stop at his cell door. (Doc. 1, ¶ 42). Plaintiff reported the rape to Bard and requested medical attention, but Bard waited several hours before summoning medical assistance. (Doc. 1, ¶ 43). Plaintiff alleges that Bard acted with animus towards Plaintiff as a male rape victim, a Latino and a person with mental illness, and furthermore that other inmates of Hispanic descent and/or with mental disabilities previously filed grievances against Bard complaining of his hostile words and actions. (Doc. 1, ¶¶ 44-45).

Nurse Roland eventually came to see Plaintiff in response to Bard's belated request, and Plaintiff described the assault as well as his continued pain and bleeding. (Doc. 1, ¶ 46). However, Roland failed to examine Plaintiff, provide any treatment, take photographs of Plaintiff's injuries, or administer a rape kit. (Doc. 1, ¶¶ 47-48). Plaintiff alleges that Roland acted with animus towards Plaintiff as a male rape victim, a Latino and a person with mental illness, and furthermore that other inmates of Hispanic descent and/or with mental disabilities previously filed grievances against Roland complaining of his hostile words and actions. (Doc. 1, ¶¶ 48-49).

The following day, June 18, 2014, Plaintiff was visited and interviewed by a CO from the security office and the state police. (Doc. 1, ¶ 50). PA Gillmen also visited Plaintiff

that day, but he refused to physically examine Plaintiff or provide treatment for his injuries. (Doc. 1, ¶¶ 51-52). Plaintiff alleges that Gillmen acted with animus towards Plaintiff as a male rape victim, a Latino and a person with mental illness, and furthermore that other inmates of Hispanic descent and/or with mental disabilities previously filed grievances against Gillmen complaining of his hostile words and actions. (Doc. 1, ¶¶ 52-53). Around this time, Plaintiff was also moved from the RHU to the infirmary. (Doc. 1, ¶ 54). Plaintiff never received an examination by a physician, treatment, or psychological counseling in the aftermath of the rape. (Doc. 1, ¶¶ 57-58).

While in the infirmary, Plaintiff drafted grievances on or about June 19 and 20, 2014, but was unable to deposit them in a secure lockbox as is required by DOC policy because there were no lockboxes inside the infirmary. (Doc. 1, ¶¶ 60-63). Instead, Plaintiff was forced to hand his grievances to CO Oliver and asked Oliver to forward them to Assistant to the Superintendent Lisa Hollibaugh. (Doc. 1, ¶ 64). Plaintiff never received a response to these grievances, as well as several others complaining of the rape and subsequent medical treatment or lack thereof. (Doc. 1, ¶¶ 64-65). Hollibaugh told Plaintiff that she never received the grievances, but Plaintiff claims that "Hollibaugh systematically lost, mishandled, delayed, or wrongfully rejected [the grievances] for various disingenuous and far-fetched reasons." (Doc. 1, ¶¶ 64, 66). Specifically, Plaintiff claims that Hollibaugh wrongly rejected several grievances on the grounds that they were not compliant with DC-ADM 804 or published on the proper form. (Doc. 1, ¶ 68). On other occasions, Plaintiff states that Hollibaugh ridiculed him while mishandling his grievances. (Doc. 1, ¶ 70). Plaintiff further alleges that Hollibaugh's suppression of Plaintiff's grievances was a ploy to discredit Plaintiff while covering up her own misconduct and the misconduct of SCI-

5

Smithfield staff members that led to Plaintiff's rape and subsequent mistreatment. (Doc. 1, ¶ 66). Due to Hollibaugh's practice of suppressing grievances, Plaintiff claims that Superintendent Fisher, Deputy Superintendent Whitesel, Oliver, Lear, Bard, Abrashoff, Ronald, Gillmen, and others were all encouraged to abuse inmates because they were shielded from consequences through the grievance system. (Doc. 1, ¶ 67). In particular, Hollibaugh purportedly told Whitesel, Oliver, Lear, Bard, and Abrashoff not to worry about reports of abuse from mentally ill inmates such as Plaintiff. (Doc. 1, ¶ 72). Further, Plaintiff alleges that Hollibaugh knew that COs in the RHU forced prisoners to cell with other violent inmates because she toured the RHU and received reports from other staff members. (Doc. 1, ¶ 74). Plaintiff likewise claims that Fisher knew of staff abusing inmates, the suppression of grievances, and that COs in the RHU forced prisoners to cell with other violent inmates because he toured the RHU and received reports from Hollibaugh and other staff members. (Doc. 1, ¶¶ 76-78).

On one occasion while he was housed in the infirmary, Plaintiff requested access to the rape hotline, a means of reporting sexual abuse under DOC policy, but this request was rejected. (Doc. 1, ¶¶ 79-80). When Plaintiff attempted to grieve this rejection, he was ridiculed and his request was ignored by Whitesel. (Doc. 1, ¶¶ 81-82). The lack of response Plaintiff received from SCI-Smithfield staff thrust him into a state of despair, further exacerbated by the lack of psychological or medical treatment available in the wake of the sexual assault. (Doc. 1, ¶¶ 83-85). In late July of 2014, Plaintiff attempted suicide. (Doc. 1, ¶ 87). Shortly thereafter, Plaintiff was transferred out of SCI-Smithfield and, after a brief stint in the acute psychiatric treatment unit of a nearby prison, was sent to SCI-Waymart. (Doc. 1, ¶¶ 88-89).

Plaintiff was housed in a dormitory-style psychiatric treatment unit at SCI-Waymart, but he alleges that Superintendent Gavin and Assistant to the Superintendent Vinansky failed to ensure that staff members in the psychiatric treatment unit were properly trained to deal with mentally ill prisoners. (Doc. 1, ¶¶ 90-91). On September 5, 2014, Plaintiff got into a heated exchange with CO Stoney, in which Stoney referred to Plaintiff by a racial slur and Plaintiff responded with a sexual epithet. (Doc. 1, ¶ 92). Stoney then left Plaintiff's cell and summoned CO Martin, CO Strasburger, CO James, and CO Brodhead to assist him in inflicting a beating on Plaintiff. (Doc. 1, ¶ 93). The COs returned to Plaintiff's cell with restraints and blunt-force weapons, placed him in restraints, and removed Plaintiff into a hallway where no cameras were present. (Doc. 1, ¶¶ 94-95, 104, 116). Despite Plaintiff's pleas and apologies, Stoney, Martin, Strasburger, James, and Brodhead twisted his hands and arms against the restraints then kicked and beat him severely. (Doc. 1, ¶¶ 95, 97). At several points, Plaintiff shouted that he was not resisting, but the beating continued until Plaintiff was left with a black eye, bruises throughout his body, and cracked ribs. (Doc. 1, ¶¶ 96, 106). Several prisoners overheard or saw parts of the assault, but Stoney, Martin, Strasburger, James, and Brodhead ignored these prisoners' please for the beating to stop and told the prisoners that Plaintiff was being beaten because he was a "Spic" and a "faggot" who disrespected the officers. (Doc. 1, ¶¶ 103, 105). Plaintiff alleges that Stoney, Martin, Strasburger, James, and Brodhead inflicted the beating out of animus towards Plaintiff as a Hispanic and a person with mental illness, and furthermore that other inmates who were racial minorities and/or had mental disabilities previously filed grievances against them complaining of their hostile words and actions. (Doc. 1, ¶¶ 101-02, 114). After the attack, Stoney, Martin, Strasburger, James, and Brodhead left without summoning medical

assistance, and Plaintiff never received medical care for his injuries or psychological treatment. (Doc. 1, ¶¶ 108-09).

Plaintiff attempted to report the assault through grievances to Gavin and Vinansky, but these grievances were "irregularly blocked" by Vinansky. (Doc. 1, ¶¶ 110-11). Furthermore, Plaintiff claims that Gavin and Vinansky knew that COs had abused prisoners with mental disabilities in the past but tolerated this abuse as a means of keeping order at SCI-Waymart, which further emboldened the COs. (Doc. 1, ¶¶ 112-13).

Plaintiff contends that the sexual assault at SCI-Smithfield, the beating at SCI-Waymart, and the subsequent frustrations with the grievance review process combined to delay Plaintiff's parole review status for several months. (Doc. 1, ¶¶ 119-22). Additionally, Plaintiff alleges that he was discriminated against and unfairly denied or limited access to many aspects of DOC programming because of his mental disability while incarcerated at SCI-Smithfield and SCI-Waymart, including use of the law library, use of the commissary, educational programming, physical exercise, and common mealtimes. (Doc. 1, ¶¶ 123-25). Had the DOC offered him reasonable housing accommodations, medical care, and psychological counseling, Plaintiff claims that he would have been able to participate in DOC programming on equal footing. (Doc. 1, ¶ 128).

In the first ten counts of his complaint, Plaintiff advances a variety of claims under 42 U.S.C. § 1983 for violations of his rights under the Eighth and Fourteenth Amendments against all individual Defendants. (Doc. 1, ¶¶ 140-82). Counts XI and XII assert ADA and RA claims solely against the DOC. (Doc. 1, ¶¶ 183-88). Lastly, Plaintiff devotes the final three counts of his complaint to raising state law claims against the individual Defendants. (Doc. 1, ¶¶ 189-204). In the pending motion to dismiss, the moving Defendants seek

dismissal of some, but not all, of Plaintiff's claims and additionally request that Plaintiff be compelled to amend the caption of the complaint to include his full name. (Doc. 12).

## II.   STANDARDS OF REVIEW

### A.   RULE 12(B)(6) MOTION TO DISMISS STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Additionally, a court need not assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations

must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In evaluating this motion to dismiss, the Court may "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case," in addition to the facts alleged in Plaintiff's complaint. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

B. RULE 12(E) MOTION FOR A MORE DEFINITE STATEMENT STANDARD

Rule 12(e) of the Federal Rules of Civil Procedure authorizes a defendant to move "for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "The motion must . . . point out the defects complained of and the details desired." Fed. R. Civ. P. 12(e). Rule 10(a) requires, among other things, that "[t]he title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). A motion for a more definite statement is one tool by which a defendant may seek to remedy alleged deficiencies under Rule 10. *See, e.g.*, *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 367 (11th Cir. 1996).

III. DISCUSSION

A. SECTION 1983 CLAIMS

Plaintiff's complaint asserts several federal civil rights claims pursuant to 42 U.S.C. § 1983. Section 1983 provides a private cause of action with respect to violations of federal constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To state a § 1983 claim, a plaintiff must demonstrate that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

### 1. Personal involvement

The moving Defendants first assert that several of Plaintiff's § 1983 claims must fail because Plaintiff has insufficiently alleged that various Defendants were personally involved in any deprivation of his constitutional rights. (Doc. 13, at 13-16). It is well established that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (citations and quotations omitted). Defendants broadly argue that two categories of Plaintiff's claims fail for lack of personal involvement: (1) his claims against Whitesel, Oliver, Lear, Bard, and Abrashoff premised on their alleged mishandling of Plaintiff's grievances; and (2) his claims against Fisher, Hollibaugh, Gavin, and Vinansky premised on supervisory liability. (Doc. 13, at 13-16).

### a. Mishandling of grievances

In their supporting brief, the moving Defendants note that Whitesel, Oliver, Lear, Bard, and Abrashoff are accused by Plaintiff of mishandling or suppressing grievances.

(Doc. 13, at 14-16). Neither the filing of a grievance nor participation in "after-the-fact" grievance review is sufficient to establish personal involvement. *See Pressley v. Beard*, 266 F. App'x. 216, 218 (3d Cir. 2008) (not precedential) ("The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them."); *Brooks v. Beard*, 167 F. App'x. 923, 925 (3d Cir. 2006) (not precedential) (holding that allegations that prison officials responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the underlying constitutional deprivation); *Ramos v. Pa. Dep't of Corr.*, No. CIV. 4:CV–06–1444, 2006 WL 2129148, at *3 (M.D. Pa. July 27, 2006) ("[C]ontentions that certain correctional officials violated an inmate's constitutional rights by failing to follow proper procedure or take corrective action following his submission of an institutional grievance are generally without merit."); *Wilson v. Horn*, 971 F. Supp. 943, 947 (E.D. Pa. 1997) (noting that prison officials' failure to respond to inmate's grievance does not state a constitutional claim), *aff'd*, 142 F.3d 430 (3d Cir. 1998) (table). Furthermore, this Court is guided by the well-established principle that inmates "do not have a constitutional right to a prison grievance system." *Arroyo v. Li*, No. 3:CV–13–1506, 2014 WL 4294506, at *3 (M.D. Pa. Aug. 28, 2014) (citing *Jones v. North Carolina Prisoners Labor Union*, 433 U.S. 119, 137–38 (1977) (Burger, J., concurring); *Speight v. Sims*, 283 F. App'x. 880, 881 (3d Cir. 2008) (not precedential)). Accordingly, any attempt by Plaintiff to establish liability against Whitesel, Oliver, Lear, Bard, and Abrashoff solely based upon their inappropriate responses to his request slips and grievances does not support a constitutional claim. *See Alexander v. Gennarini*, 144 F. App'x. 924, 925 (3d Cir. 2005) (not precedential) (affirming dismissal of § 1983 claims because the allegations

"merely assert[ed] [defendants'] involvement in the post-incident grievance process," which is not a basis for § 1983 liability); *Okey v. Strebig*, 531 F. App'x. 212, 215 (3d Cir. 2013) (not precedential) ("The failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional violation." (citation omitted)).

In his oppositional brief, Plaintiff counters that he does not merely rely on the denial of grievances as the lone basis for these Defendants' liability. (Doc. 18, at 18-19). As an example, Plaintiff points to his allegations that Lear placed Plaintiff in a cell with Holtzman despite Plaintiff's implorations that Holtzman would assault him because of Plaintiff's status as a former gang member, and that Abrashoff later refused to reassign Plaintiff to a safer cell. (Doc. 1, ¶¶ 25-28). Likewise, Plaintiff notes his accusation in the complaint that Bard delayed several hours before summoning medical assistance upon learning of Plaintiff's rape. (Doc. 1, ¶¶ 42-43). The Court finds that these factual averments sufficiently allege personal involvement on the part of Lear, Abrashoff, and Bard.

The personal involvement of Whitesel and Oliver is a different matter, however. Plaintiff alleges that Whitesel and Oliver "subvert[ed] DOC administrative procedures designed to prevent [abuse of inmates]." (Doc. 18, at 18-19). In practice, this "subversion" merely consisted of ignoring Plaintiff's grievances and complaints.[2] (Doc. 1, ¶¶ 64, 67, 72, 81-83). As noted above, however, the failure to respond to grievances is not a sufficient basis for establishing personal involvement. *See, e.g., Paluch v. Sec'y Pennsylvania Dep't Corr.*, 442 F.

---

[2] Plaintiff also alleges that Whitesel ridiculed him in response to one of Plaintiff's grievances. (Doc. 1, ¶ 82). However, the use of words alone, no matter how abusive, does not rise to the level of a constitutional violation. *See Wilson v. Horn*, 971 F. Supp. 943, 948 (E.D. Pa. 1997) ("The verbal abuse and harassment of which he complains, although not commendable, does not rise to the level of a constitutional violation."), *aff'd*, 142 F.3d 430 (3d Cir. 1998) (table).

App'x. 690, 695 (3d Cir. 2011) (not precedential) (affirming that district court's summary dismissal at the screening stage "was appropriate because there is no apparent obligation for prison officials to investigate prison grievances"). Moreover, to the extent that Plaintiff alleges that there was a custom in place at SCI-Smithfield of suppressing inmate grievances in order to encourage COs to commit further inmate abuses without consequence, neither Whitesel nor Oliver are alleged to be supervisory officials responsible for devising that scheme. Plaintiff's efforts to couch his claims against Whitesel and Oliver in terms of a conspiracy is likewise unavailing, as § 1983 conspiracy claims still must allege the personal involvement of the defendant allegedly involved in the conspiracy. *See Ulrich v. Corbett*, 614 F. App'x 572, 573 (3d Cir. 2015) (not precedential) (affirming denial of civil rights conspiracy claim for lack of personal involvement). Here, Whitesel and Oliver's after-the-fact suppression of Plaintiff's grievances took place after the harm to Plaintiff had already been done; they are not alleged to be involved in any of the events that gave rise to Plaintiff's rape and subsequent denial of medical care. Accordingly, it is respectfully recommended that any federal law claims against Whitesel and Oliver be dismissed with prejudice for lack of personal involvement.

### b. Supervisory liability

Defendants next allege that Plaintiff fails to state claims against Fisher, Hollibaugh, Gavin, and Vinansky under the theory of supervisory liability. (Doc. 13, at 14-16). It is well established that "liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Padilla v. Beard,* No. CIV. 1:CV–06–0478, 2006 WL 1410079, at *3 (M.D. Pa. May 18, 2006) ("[A]n allegation seeking to impose liability on a defendant based on supervisory status, without more, will not

subject the official to section 1983 liability."). However, a prison supervisor may be personally liable under § 1983 through "'two theories of supervisory liability,' one under which supervisors can be liable if they 'established and maintained a policy, practice or custom which directly caused [the] constitutional harm,' and another under which they can be liable if they 'participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations.'" *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010) (quoting *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.,* 372 F.3d 572, 586 (3d Cir. 2004) (alterations in original)). "'Failure to' claims—failure to train, failure to discipline, or . . . failure to supervise—are generally considered a subcategory of policy or practice liability." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds sub nom. Taylor v. Barkes*, 135 S. Ct. 2042 (2015).

### i.   Fisher and Hollibaugh

As the purported basis for his supervisory liability claims against Fisher and Hollibaugh, Plaintiff alleges that "Fisher ordered or acquiesced in Hollibaugh's diversion of abuse reports," enabling COs to abuse prisoners like Plaintiff. (Doc. 18, at 20). The Court construes Plaintiff's allegations as asserting that Fisher and Hollibaugh instituted a practice of suppressing inmate complaints and grievances knowing that it would result in COs abusing mentally disabled prisoners without fear of repercussion, so that SCI-Smithfield staff and supervisors could maintain control over the overcrowded prison. (Doc. 1, ¶¶ 67, 72-74, 76-78). In regard to "policy, practice, or custom" claims, the United States Court of Appeals for the Third Circuit has instructed:

> [T]o hold a supervisor liable because his policies or practices led to an Eighth
> Amendment violation, the plaintiff must identify a specific policy or practice

that the supervisor . . . employ[ed] and show that: (1) the existing policy or
practice created an unreasonable risk of the Eighth Amendment injury; (2) the
supervisor was aware that the unreasonable risk was created; (3) the
supervisor was indifferent to that risk; and (4) the injury resulted from the
policy or practice.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001) (citing *Sample v. Diecks*, 885
F.2d 1099, 1118 (3d Cir. 1989)).

A supervisor "employs" an unconstitutional policy, practice, or custom if he or she
"establishe[s] or enforce[s] policies and practices directly causing the constitutional
violation." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 223 (3d Cir. 2015).

In the case at bar, the well-pleaded factual allegations in Plaintiff's complaint are
sufficient to state a supervisory liability claim against Fisher and Hollibaugh. First, Plaintiff
alleges that Fisher conceived and Hollibaugh implemented the practice of suppressing
inmate grievances in order to shield COs from discipline and thereby freeing them to abuse
inmates, as a means of asserting institutional control over the overcrowded prison. (Doc. 1,
¶¶ 67, 72-78). Plaintiff further states that the practice of suppressing grievances created a
known substantial risk that Plaintiff's Eighth Amendment rights would be violated, to which
Fisher and Hollibaugh were indifferent. A supervisor is indifferent to a known substantial
risk where "the supervisory official failed to respond appropriately in the face of an
awareness of a pattern of such injuries" or where "the risk of constitutionally cognizable
harm is so great and so obvious that the risk and the failure of supervisory officials to
respond will alone support" a finding of deliberate indifference. *Sample*, 885 F.2d at 1118.
Plaintiff sufficiently alleges that Fisher and Hollibaugh were aware of a pattern of injuries
stemming from this practice, as Hollibaugh witnessed and read grievances complaining of
COs "forcing vulnerable prisoners into cells with prisoners who expressed hostility,
including but not limited to expressions of intent to commit sexual assault," and then

reported on those occurrences to Fisher. (Doc. 1, ¶¶ 74, 78). Finally, Plaintiff asserts that Fisher and Hollibaugh's practice of ignoring all inmate grievances caused his injuries because it encouraged Lear, Abrashoff, Bard, and Gillmen to violate Plaintiff's Eighth Amendment rights by knowingly assigning him to cell with a threatening inmate and subsequently denying him medical treatment. (Doc. 1, ¶¶ 67, 73). Accordingly, the Court finds that Plaintiff sufficiently states a supervisory liability claim against Fisher and Hollibaugh on the basis of their purported practice of suppressing inmate grievances knowing that it would allow COs to abuse mentally disabled prisoners without consequence.[3] *See Wilson v. Gilmore*, No. 14CV1654, 2015 WL 3866531, at \*6 (W.D. Pa. June 22, 2015) ("Taking these allegations as true, Plaintiff has stated a plausible claim that [the] Superintendent['s] . . . actions of ignoring inmate abuse complaints and failing to discipline correctional officers for violating the aforementioned DOC policies created an unreasonable risk that the officers, including the other defendants, would violate these policies knowing that they would not be disciplined for such conduct and that these actions indirectly caused his injuries."); *Walker v. George W. Hill Corr. Facility*, No. CIV.A.07-2663, 2007 WL 3237925, at \*2 (E.D. Pa. Oct. 26, 2007) ("Defendants could be liable in their official capacities if evidence is presented that it was the policy or custom of the prison to ignore such grievances.").

---

[3] The moving Defendants correctly point out that Hollibaugh's mishandling of Plaintiff's after-the-fact grievances cannot form the basis of a supervisory liability claim. (Doc. 13, at 14-15). Although Plaintiff does devote much of his complaint to bemoaning Hollibaugh's practices in mishandling Plaintiff's own grievances, it is Hollibaugh and Fisher's practice of suppressing grievances *prior to* Plaintiff's injuries that gives rise to their liability. (Doc. 1, ¶¶ 62-71).

## ii.   Gavin and Vinansky

Plaintiff puts forth two bases for supervisory liability in regard to Gavin and Vinansky. First, he claims that Gavin and Vinansky are responsible for failing to train COs in the therapeutic housing unit at SCI-Waymart to appropriately care for and accommodate mentally ill inmates. (Doc. 18, at 20). Second, Plaintiff alleges that Gavin and Vinansky tolerated acts of brutality against mentally disabled prisoners at SCI-Waymart as a means of exerting institutional control. (Doc. 1, ¶¶ 112-13; Doc. 18, at 20). The Court construes these allegations of supervisory liability against Gavin and Vinansky as "failure to discipline" and "failure to train" claims.[4]

Plaintiff's allegations of inadequate supervision against Gavin and Vinansky require the Court to apply the same test that was set forth in *Sample v. Diecks* and discussed above in regard to Fisher and Hollibaugh. 885 F.2d 1099, 1118 (3d Cir. 1989). Plaintiff alleges that Gavin and Vinansky failed to: (1) employ adequate training practices to ensure that COs in the therapeutic housing unit would appropriately care for and accommodate mentally ill inmates; and (2) discipline those who committed acts of brutality against inmates with mental disabilities. (Doc. 1, ¶¶ 91, 110-13). However, Plaintiff fails to establish how this inadequate training and discipline created an unreasonable risk of harm that was known to both Gavin and Vinansky. *See Sample*, 885 F.2d at 1118; *see also Broadwater v. Fow*, 945 F.

---

[4] Contrary to Plaintiff's argument in his brief in opposition to the motion to dismiss, Plaintiff does not put forth factual allegations to support a finding that Gavin and Vinansky adopted a practice of suppressing inmate grievances in order to insulate COs at SCI-Waymart from facing repercussions for abusing inmates. (Doc. 18, at 20). Indeed, the complaint only supports a finding that Gavin and Vinansky interfered with Plaintiff's *own* grievances, but contains no averments that Gavin and Vinansky regularly suppressed other inmates' grievances before Stoney, Martin, Strasburger, James, and Brodhead assaulted Plaintiff. (Doc. 1, ¶¶ 110-13).

Supp. 2d 574, 588 (M.D. Pa. 2013) ("A failure to train only amounts to deliberate indifference 'where the need for more or different training is obvious' and the lack of training can be expected to result in constitutional violations." (quoting *Carter v. City of Phila.,* 181 F.3d 339, 357 (3d Cir. 1999)). Here, Plaintiff has not shown how the need for more or different training and discipline was obvious to Gavin and Vinansky. For instance, although Plaintiff claims that other inmates who were mentally ill or racial minorities filed grievances alleging hostile language or behavior by Martin, Strasburger, James, Brodhead, or Stoney in the past, Plaintiff does not allege that Gavin or Vinansky ever saw those grievances or otherwise had reason to suspect that Martin, Strasburger, James, Brodhead, or Stoney posed a threat to Plaintiff. (Doc. 1, ¶ 102); *see also Broadwater,* 945 F. Supp. 2d at 588 ("A plaintiff may not allege that a supervisory defendant had constructive knowledge of a subordinate's unconstitutional conduct simply because of his role as a supervisor."). Plaintiff's vague assertion that "Gavin and Vinansky knew of other instances of brutality against prisoners with mental disabilities . . . but . . . tolerated such brutality and actively encouraged it" is likewise unavailing, as the statement does not even specify whether the attacks were carried out by COs as opposed to other inmates, and further neglects to explain how Gavin and Vinansky purportedly learned of these attacks. (Doc. 1, ¶ 112); *see also Wood v. Williams,* 568 F. App'x 100, 107 (3d Cir. 2014) (not precedential) (affirming dismissal where "[t]he complaint contained no specific factual allegations fleshing out the claims of supervisory liability."). This allegation of unspecified past brutalities against inmates with mental disabilities falls short of establishing that "it was *so* predictable that failing to train [and discipline COs] amounted to *conscious disregard*" for Plaintiff's rights by Gavin and Vinansky and was the proximate cause of Plaintiff's assault. *Connick v. Thompson,* 563 U.S.

19

51, 71 (2011) (emphasis in original). Accordingly, it is respectfully recommended that all federal law claims seeking to impose supervisory liability on Gavin and Vinansky on the basis of their purported failure to implement sufficient training and discipline be dismissed without prejudice for failure to state a claim.

### 2. State-created danger

Defendants next argue that Count I of the complaint should be dismissed because Plaintiff fails to allege a state-created danger claim against Lear. (Doc. 13, at 16-20). "When the affirmative exercise of state authority either results in a citizen's injury or leaves a citizen more vulnerable to injury at the hands of a third party, the government contravenes the substantive due process protections of the Fourteenth Amendment" and a state-created danger claim arises. *D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 624 (M.D. Pa. 2009) (citing *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)). In order to establish a claim for state-created danger, a plaintiff must allege four elements:

> (1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

Although the moving Defendants contest all four elements of Plaintiff's state-created danger claim against Lear, the first three elements are relatively easily satisfied in Plaintiff's favor. First, the harm to Plaintiff was foreseeable because Holtzman had a known reputation for violence and Plaintiff specifically warned Lear that Holtzman was going to attack Plaintiff because of his gang status. (Doc. 1, ¶¶ 25-26). Second, Plaintiff has sufficiently alleged that Lear displayed willful disregard for Plaintiff's safety by ordering him

into Holtzman's cell despite knowing that Holtzman presented a violent threat to Plaintiff. (Doc. 1, ¶ 27). Third, a relationship existed because Plaintiff was incarcerated by the Commonwealth. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ."). The fourth and final element of Plaintiff's state-created danger claim requires further analysis, however.

Plaintiff urges the Court to find that he has adequately pleaded that Lear used his authority as a Commonwealth employee to create an opportunity for danger to Plaintiff that otherwise would not have existed. (Doc. 18, at 23-24). Defendants, on the other hand, argue that Plaintiff fails to allege that Lear committed an affirmative act, as is needed to adequately plead a state-created danger claim. (Doc. 13, at 19-20). Plaintiff counters that a state-created danger claim does not require an affirmative act when alleged in a prison context. (Doc. 18, at 22-23 (citing *Barkes v. First Corr. Med., Inc.* 766 F.3d 307, 316 (3d Cir. 2014) *rev'd on other grounds sub nom. Taylor v. Barkes*, 135 S. Ct. 2042 (2015)). However, the moving Defendants correctly point out in their reply brief that *Barkes* is not binding authority on this Court, given that there was no state-created danger claim before the Third Circuit panel that decided *Barkes* and so the panel majority's ruminations as to the "affirmative act" requirement in a prison setting constitutes dicta. (Doc. 20, at 6-7).

Although the Court finds that the "affirmative act" requirement has not been completely erased in a prison setting, a state actor's failure to protect an individual in state custody constitutes an affirmative choice by that state actor. *See Kneipp v. Tedder*, 95 F.3d

1199, 1209 (3d Cir. 1996) (finding that "affirmative act" requirement was satisfied where police officer detained a visibly intoxicated female, causing her to be separated from her less intoxicated husband who was accompanying her, and then sending the female to walk home unescorted in cold weather and knowing that she was in a severely intoxicated state); *see also White v. Rochford*, 592 F.2d 381, 384 (7th Cir. 1979) ("[I]t seems incongruous to suggest that liability should turn on the tenuous metaphysical construct which differentiates sins of omission and commission."). In applying that standard to the facts of this case, the Court finds that Plaintiff sufficiently alleges affirmative conduct by Lear due to the fact that Plaintiff was entrusted to Lear's custody and left in Holtzman's cell despite Lear's purported knowledge that Plaintiff would be endangered given the animosity expressed by Holtzman towards Plaintiff on the basis of Plaintiff's former gang membership. (Doc. 1, ¶¶ 25-27). Accordingly, the Court concludes that Plaintiff has sufficiently made out the elements of a state-created danger claim against Lear.

In addition to arguing that Plaintiff's state-created danger claim fails on the merits, the moving Defendants also assert that this claim should be dismissed pursuant to the more-specific-provision rule. (Doc. 13, at 20 n.2; Doc. 20, at 7). The more-specific-provision rule mandates that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). Here, it appears that Plaintiff's state-created danger claim against Lear under substantive due process is "covered" by the Eighth Amendment's protection against cruel and unusual punishment that proscribes inmates from being incarcerated under conditions that pose a substantial risk of serious harm, which

22

Plaintiff asserts against Lear in Count II of his complaint. (Doc. 1, ¶¶ 140-48). Nevertheless, the Court notes that Plaintiff has not had an opportunity to brief this issue due to space constraints and the fact that the moving Defendants only fleetingly mentioned this defense in their brief in support of the motion to dismiss. (Doc. 18, at 24 n.6 (citing Doc. 13, at 20 n.2)). In light of the fact that this argument has not been fully briefed, the Court finds that it is best to defer judgment on whether Plaintiff's state-created danger claim runs afoul of the more-specific-provision rule at this time.

Accordingly, the Court respectfully recommends that Defendants' motion to dismiss Plaintiff's state-created danger claim against Lear be denied, without prejudice to Defendants' ability to re-raise their more-specific-provision defense in response to a prospective amended complaint or in a motion for summary judgment.

### 3.   Deliberate indifference to a substantial risk of harm

The moving Defendants next contend that Plaintiff's Eighth Amendment "failure to protect" claims against Lear and Abrashoff both fail. (Doc. 13, at 20-22). The Eighth Amendment protects prisoners from the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. To prevail on any Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively sufficiently serious; and (2) "a sufficiently culpable state of mind" of the defendant official. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Beyond this general standard, there are different types of Eighth Amendment claims, and different criteria apply depending on the type of violation alleged. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Here, Plaintiff alleges that Lear and Abrashoff displayed deliberate indifference to the risk that Plaintiff would be assaulted by Holtzman, another inmate. (Doc. 18, at 25); *see*

*also Farmer*, 511 U.S. at 833 ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). In regard to this "failure to protect" subcategory of Eighth Amendment claims, a sufficiently serious deprivation occurs when an inmate "is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Furthermore, a prison official acts with a sufficiently culpable state of mind where the official displays deliberate indifference to the inmate's safety by recklessly disregarding a known and substantial risk of harm to that inmate. *See Farmer*, 511 U.S. at 836. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A prison official thus does not violate the Eighth Amendment by failing "to alleviate a significant risk that he should have perceived but did not . . . ." *Farmer*, 511 U.S. at 838.

### a.  Lear

The moving Defendants assert that Plaintiff's failure to protect claims against Lear and Abrashoff must fail because neither Defendant was objectively aware of the risk caused by housing Plaintiff with Holtzman. (Doc. 13, at 22). Specifically, the moving Defendants argue that inmates frequently protest cell assignments and fabricate reasons to receive a single cell, thus making cell assignments a difficult process for COs because they often are unable to tell whether inmate excuses and warnings are legitimate. (Doc. 13, at 18, 20-21). However, Plaintiff points to sufficient facts to establish that Lear knew that housing Plaintiff with Holtzman would place Plaintiff in substantial risk of harm. As opposed to generally protesting his cell assignment, Plaintiff avers that he specifically told Lear that he feared

Holtzman would attack him because of Plaintiff's status as a former gang drop-out, and then produced his form DC-141 to confirm this status. (Doc. 1, ¶¶ 25-26; Doc. 18, at 25). These allegations are sufficient to show that Lear was aware that Holtzman posed a substantial risk of harm to Plaintiff, and yet Lear chose to ignore that risk.

### b.  Abrashoff

On the other hand, Plaintiff's factual averments concerning Abrashoff are sparse. Plaintiff merely asserts that he "immediately asked for help from [Abrashoff], who was supervising the RHU at the time, but [Abrashoff] refused to move R.B. away from Holtzman to a safer cell." (Doc. 1, ¶ 28). In contrast to Lear, Plaintiff does not allege that he showed Abrashoff the form DC-141 or even explained to Abrashoff that he felt endangered because of gang animosity between Plaintiff and Holtzman. Simply put, the complaint does not contain any basis to conclude that Abrashoff knew that Holtzman presented a substantial risk of serious harm to Plaintiff. *See Farmer*, 511 U.S. at 836-38. Given the absence of such allegations, Plaintiff fails to establish that Abrashoff acted with "a sufficiently culpable state of mind" *Farmer*, 511 U.S. at 834.

Accordingly, the Court finds that Plaintiff states a valid Eighth Amendment failure to protect claim against Lear but fails to do so in regard to Abrashoff. It is therefore respectfully recommended that Plaintiff's Eighth Amendment failure to protect claims against Abrashoff be dismissed without prejudice.

### 4.  Deliberate indifference to a serious medical need

The moving Defendants next argue that Plaintiff's Eighth Amendment claims for deliberate indifference to a serious medical need should also be dismissed. (Doc. 13, at 22-24). To state a claim for deliberate indifference to a serious medical need, a plaintiff must

allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need exists if the failure to treat a medical condition "may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05. As with the failure to protect claim discussed above, in order to be liable for deliberate indifference to a serious medical need a defendant "must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and draw the inference." *Natale*, 318 F.3d at 582 (quotations and alterations omitted).

### a. Abrashoff

First, the Court notes that Plaintiff's deliberate indifference to a serious medical need claim against Abrashoff must fail because Plaintiff's only interaction with Abrashoff alleged in the complaint occurred before Plaintiff's serious medical need arose. (Doc. 1, ¶¶ 28, 149-53). Indeed, Plaintiff alleges that Abrashoff refused to move him away from Holtzman and to a safer cell "immediately" after Lear assigned Plaintiff to Holtzman's cell. (Doc. 1, ¶¶ 27-28). Moreover, the rape that caused Plaintiff's serious medical need did not take place until the following day. (Doc. 1, ¶ 34). Because there was no need of medical treatment when Abrashoff encountered Plaintiff, the Eighth Amendment deliberate indifference to a serious

medical need claim asserted against Abrashoff in Count III of the complaint should be dismissed without prejudice.[5]

### b. Bard

The moving Defendants also assert that Plaintiff's deliberate indifference to a serious medical need claim against Bard should be dismissed because Bard's delay in seeking medical assistance was "arguably minimal in nature." (Doc. 13, at 23). Plaintiff encountered Bard and requested medical attention nine days after the rape and while Plaintiff "was still bleeding and in pain," so there is no dispute that Plaintiff had a serious medical need and that Bard was aware of that need. (Doc. 1, ¶¶ 42-43). The parties instead contest whether Bard's decision to "wait[ ] several hours" before summoning medical assistance constitutes deliberate indifference. (Doc. 13, at 23; Doc. 18, at 26). In support of their position, the moving Defendants cite to several cases where a delay of a day or two in summoning medical treatment or supplies has been held not to rise to the level of deliberate indifference. (Doc. 13, at 23 (citing *McKenzie v. Wetzel*, No. CV 14-320 ERIE, 2016 WL 1068374, at *5 (W.D. Pa. Feb. 10, 2016) (one-day delay in treatment of knee pain after a fall), *report and recommendation adopted*, No. CV 14-320, 2016 WL 1077904 (W.D. Pa. Mar. 17, 2016); *Evans v. Rozum*, No. CIV.A. 07-2301, 2009 WL 5064490, at *6 (W.D. Pa. Dec. 17, 2009) (two-day delay in providing bowel program supplies was not deliberate indifference))). Plaintiff counters by arguing that his own medical situation was more pressing than the examples cited by Defendants. (Doc. 18, at 26). In general, delays in medical care only constitute an

---

[5] To the extent that Plaintiff may have had other interactions with Abrashoff after the rape in which Abrashoff refused to call for medical assistance on Plaintiff's behalf, those encounters were not sufficiently set forth in Plaintiff's complaint. Plaintiff may provide specific factual allegations as to those interactions in a prospective amended complaint.

Eighth Amendment violation if the delay results in harm. *Evans*, 2009 WL 5064490, at *6 (citing *Brooks v. Kyler,* 204 F.3d 102, 105 n. 4 (3d Cir. 2000)); *see also Langston v. Peters*, 100 F.3d 1235, 1241 (7th Cir. 1996) (granting summary judgment on Eighth Amendment deliberate indifference to serious medical need claim where plaintiff failed to produce any evidence that one-hour day in obtaining medical care after plaintiff's rape caused a detrimental effect). Given the fact that Plaintiff alleges he was still bleeding at the time he saw Bard and asked for medical attention, the Court cannot determine at this juncture that Bard's delay was not detrimental to Plaintiff's health or otherwise exacerbated his suffering. (Doc. 1, ¶¶ 42-43). Accordingly, it is respectfully recommended that Defendants' motion to dismiss Plaintiff's Eighth Amendment deliberate indifference to a serious medical need claim against Bard be denied without prejudice to Defendants' ability to re-raise this argument in a future motion for summary judgment.

### c.   Remaining SCI-Smithfield and SCI-Waymart Defendants

As a final matter in regard to Plaintiff's deliberate indifference to a serious medical need claims, the moving Defendants contend that the SCI-Smithfield Defendants and SCI-Waymart Defendants, as non-medical professionals, may reasonably rely on the expertise of prison medical staff. (Doc. 20, at 8-9 (citing *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004); *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993)). Defendants are correct that "[i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372 F.3d at 236. However, Plaintiff specifically asserts in his complaint that he never actually received medical care or even an examination by a physician. (Doc. 1, ¶¶ 47-48, 51-52, 57, 133).

Accordingly, Defendants cannot rely on the expertise of prison medical staff to excuse their own purported indifference to Plaintiff's serious medical need at this stage.

### 5. Denial of a liberty interest in parole

The moving Defendants argue that Count X of Plaintiff's complaint should be dismissed in its entirety. (Doc. 13, at 15 n.1 (citing *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.")). In Count X, Plaintiff alleges that all SCI-Smithfield Defendants and SCI-Waymart Defendants delayed Plaintiff's parole in violation of Plaintiff's protected Fourteenth Amendment liberty interest. (Doc. 1, ¶ 180). However, "an inmate's mere anticipation of freedom, when a privilege has been granted but not yet implemented, does not give rise to a constitutionally recognized liberty interest." *Powell v. Weiss*, 757 F.3d 338, 342 (3d Cir. 2014). Furthermore, "[w]hile states may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, the Pennsylvania Supreme Court has held that 'a denial of parole does not implicate a constitutionally protected liberty interest.'" *Shaffer v. Meyers*, 338 F. Supp. 2d 562, 566 (M.D. Pa. 2004) (quoting *Coady v. Vaughn*, 770 A.2d 287, 291 (Pa. 2001)), *aff'd*, 163 F. App'x 111 (3d Cir. 2006) (not precedential). Because Plaintiff does not have a protected liberty interest in parole, it is recommended that Count X of the complaint be dismissed with prejudice.

### B. CONSPIRACY CLAIMS

The moving Defendants next assert that Plaintiff's conspiracy claims must fail because they rely on conclusory allegations. (Doc. 13, at 26-27; Doc. 20, at 10). To state a conspiracy claim under § 1983, "a plaintiff must show that two or more conspirators

reached an agreement to deprive him or her of a constitutional right under color of law."
*Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 700 (3d Cir. 1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003). Plaintiff's civil conspiracy claim under state law features similar pleading requirements, as "[t]o prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). Furthermore, "[p]roof of malice, i. e., an intent to injure, is essential in proof of a conspiracy." *Thompson Coal Co.*, 412 A.2d at 472.

"[I]t is a longstanding rule in the Third Circuit that a mere general allegation or averment of conspiracy or collusion without alleging the facts which constituted such conspiracy or collusion is a conclusion of law and is insufficient to state a claim." *Deangelo v. Brady*, 185 F. App'x. 173, 175 (3d Cir. 2006) (not precedential). Thus, as noted in *Twombly*, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57. Instead, "[t]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Coulter v. Ramsden*, 510 F. App'x 100, 103 (3d Cir. 2013) (not precedential); *see also Twombly*, 550 U.S. at 556 (requiring "enough factual matter (taken as true) to suggest that an agreement was made"); *Startzell v. City of Phila., Pa.*, 533 F.3d 183, 205 (3rd Cir. 2008) ("To constitute a conspiracy, there must be a 'meeting of the minds.'"). "A plaintiff must make specific factual allegations of combination or understanding among all, or any, of the defendants to plot, plan or conspire to carry out the alleged chain of events." *Marchese v. Umstead*, 110 F. Supp.

2d 361, 371 (E.D. Pa. 2000) (quotations omitted). "To plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Shearin v. E.F. Hutton Grp., Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494 (2000); *see also Thompson Coal Co.*, 412 A.2d at 472-73 (applying similar pleading standards to civil conspiracy claim).

In the case at bar, Plaintiff fails to allege non-conclusory, well-pled factual allegations that Defendants formed a conspiracy to deprive him of his rights sufficient to "raise [his] right to relief above the speculative level." *Twombly*, 550 U.S. at 555. First, all three conspiracy claims lack supporting allegations of an agreement among all Defendants, and fail to provide a basis for alleging the participation of each Defendant. *See Deangelo*, 185 F. App'x at 175–76. As instructed by the Supreme Court in *Iqbal*, this Court sets aside Plaintiff's conclusory allegations that the SCI-Smithfield or SCI-Waymart Defendants all "conspired with one another" (Doc. 1, ¶¶ 155, 176), or that various smaller groups of Defendants "conspired" together for different nefarious purposes (Doc. 1, ¶¶ 198-202). *Iqbal*, 556 U.S. at 679. Indeed, Plaintiff "attempts to attribute every alleged misdeed of each Defendant to all Defendants, by alleging that they were all engaged in a conspiracy." *Estate of Oliva v. New Jersey*, 579 F. Supp. 2d 643, 678 (D.N.J. 2008), *aff'd sub nom. Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788 (3d Cir. 2010). Plaintiff further fails to allege the approximate times when these agreements were made and the period of the conspiracies. *See generally Shearin*, 885 F.2d at 1166.

Plaintiff perhaps comes closest to satisfying this pleading standard in Count IV of his complaint, in which he alleges a conspiracy on the part of all SCI-Smithfield Defendants

plus Ronald and Gillmen to violate Plaintiff's Eighth Amendment rights. (Doc. 1, ¶ 155). With regard to this conspiracy claim, Plaintiff at least provides some supporting factual allegations, including the assertion that Hollibaugh told Whitesel, Oliver, Lear, Bard and Abrashoff at some point "that grievances from mentally ill prisoners like [Plaintiff] would not cause them any trouble." (Doc. 1, ¶ 72). However, even this discussion is insufficient to adduce that there was a "meeting of the minds" between all Defendants named in Count IV. *See Startzell*, 533 F.3d at 205. Moreover, although this Court believes that Plaintiff has sufficiently alleged supervisory liability on the part of Fisher and Hollibaugh due to their purported practice of suppressing inmate grievances despite knowing that the practice would encourage COs to abuse mentally disabled prisoners due to the lack of repercussions, this does not establish the "intent to deprive of a right" element of a § 1983 conspiracy claim. Even though Fisher and Hollibaugh allegedly were indifferent to the risk that their practice of ignoring inmate grievances would further embolden COs to violate inmates' Eighth Amendment rights, it does not follow that Fisher and Hollibaugh ignored grievances expressly for the purpose of denying inmates their constitutional rights. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276 (1993) ("[The 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it."). Indeed, Plaintiff notes that Fisher and Hollibaugh came up with this practice of ignoring inmate grievances "as a means of imposing control on the overcrowded prison," but does not assert that Fisher and Hollibaugh desired to deprive inmates of their Eighth Amendment rights as a goal in and of itself.  (Doc. 1, ¶¶ 76; 112).

The lack of any factual allegations to establish Defendants' intent to injure is also grounds to dismiss Plaintiff's civil conspiracy claim. *See Thompson Coal Co.*, 412 A.2d at 472.

Given these pleading deficiencies, it is respectfully recommended that Plaintiff's § 1983 and state law civil conspiracy claims each be dismissed without prejudice for failure to state a claim.

C. ADA CLAIMS

In addition to asserting claims against the individual SCI-Smithfield and SCI-Waymart Defendants under § 1983, Plaintiff also brings claims under the ADA and the RA against the DOC itself.[6] (Doc. 1, ¶¶ 183-88). Defendants argue that Counts XI and XII of Plaintiff's complaint should be dismissed because Plaintiff fails to make out the elements of an ADA claim against the DOC. (Doc. 13, at 24-25). The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). To establish a claim under the ADA, a plaintiff must show "that: (1) he is an individual with a disability;

---

[6] Although the pleading requirements under the ADA and RA are substantially similar, the RA applies exclusively to entities that receive federal funding. *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235 & n.10 (3d Cir. 2013). "States . . . waive their Eleventh Amendment immunity to RA claims when they accept federal funds." *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 199 (3d Cir. 2008). Plaintiff has sufficiently alleged that the DOC is an agency of the Commonwealth of Pennsylvania that receives federal funding. (Doc. 1, ¶ 21).

(2) he is otherwise qualified for participation in the program or activity, or for the position sought; [and] (3) he was excluded from the position sought, denied the benefits of, or subject to discrimination under the program or activity solely by reason of his or her [disability]." *Haas v. Wyoming Valley Health Care Sys.*, 553 F. Supp. 2d 390, 396 (M.D. Pa. 2008) (quotations omitted). However, "the ADA does not create a federal cause of action for prisoners challenging the medical treatment provided for their underlying disabilities." *Hubbard v. Taylor*, 452 F. Supp. 2d 533, 544 (D. Del. 2006), *aff'd*, 538 F.3d 229 (3d Cir. 2008).

Defendants argue that Plaintiff's allegations concerning his ADA claim are conclusory and devoid of specific facts needed to establish his right to relief. (Doc. 13, at 24-25). For example, Defendants stress that Plaintiff fails to: (1) provide detail as to his mental disability; (2) include dates of when he was housed in certain units that did not offer the services and programming available in other units of the institution; and (3) name the individuals responsible for placing him in these purportedly inadequate psychiatric and therapeutic units. (Doc. 13, at 24-25). As to Defendants' first concern, even though Plaintiff only has provided limited details of his mental disability, the complaint specifically alleges that Plaintiff was on the mental health roster at SCI-Smithfield and that his mental disability limits his social interaction.[7] (Doc. 1, ¶¶ 24, 123). "While the Court of Appeals for the Third

---

[7] Moreover, the specific dates and names of the COs who placed Plaintiff in each housing unit are both known to the DOC and not required to be pleaded as part of a *prima facie* case under the ADA. *See Scherer v. Pennsylvania Dep't of Corr.*, No. CIV.A. 3:2004-191, 2007 WL 4111412, at *4 (W.D. Pa. Nov. 16, 2007) ("The dates of confinement are known to the Corrections Defendants, and the specific dates of occurrences outlined in the Amended Complaint orient the Corrections Defendants sufficiently in order to comply with Federal Rule of Civil Procedure 8."); *Martinez v. Folsom Broadstone, Inc.*, No. CIV.S03-1895FCD DAD, 2004 WL 4908878, at *1 (E.D. Cal. Apr. 15, 2004) ("[P]laintiff is not

Circuit has not directly spoken on the issue, several district courts have held that social interaction is a major life activity." *McAndrew v. Mercy Health Partners*, No. CIV.A. 3:CV-01-0317, 2003 WL 23573863, at *6 (M.D. Pa. Dec. 3, 2003) (citing *Sherback v. Wright Auto. Group,* 987 F. Supp. 433, 438 (W.D. Pa. 1997); *Garvey v. Jefferson Smurfit Corp.,* 2000 WL 1586077 at *3 (E.D. Pa. Oct. 24, 2000)). Furthermore, Plaintiff's presence on the mental health roster indicates that the DOC at least perceived him as having a physical or mental impairment. *See* 42 U.S.C. § 12102(1). According, Plaintiff has adequately pleaded the first element of an ADA claim. As for the final two elements of an ADA claim, Plaintiff alleges that he "lost access to many programs, activities, and resources" including use of the law library, use of the commissary, educational programming, physical exercise, and common mealtimes that he otherwise would have been able to fully access if housed in a different unit of the institutions. (Doc. 1, ¶¶ 124-25). Lastly, Plaintiff alleges that the DOC housed him in the RHU at SCI-Smithfield and then a therapeutic unit of SCI-Waymart—both of which offered limited access to the programming and activities described above—purely on account of his disability. (Doc. 1, ¶¶ 56, 124-25, 128).

The Court therefore finds that Plaintiff has adequately pleaded a *prima facie* claim under the ADA and thus recommends that Defendants' motion to dismiss Counts XI and XII of Plaintiff's complaint be denied.

---

required to specify the date of injury in the complaint as part of his prima facie case for violation of the ADA and corresponding state laws."). To the extent that Defendants believe Plaintiff's ADA claims may be barred by the statute of limitations, they may produce evidence to that effect in a future motion for summary judgment.

D. CLAIMS AGAINST THE SCI-SMITHFIELD AND SCI-WAYMART DEFENDANTS IN THEIR OFFICIAL CAPACITIES

The moving Defendants further note that Plaintiff sues the SCI-Smithfield and SCI-Waymart Defendants in both their individual and official capacities. (Doc. 13, at 26). However, a suit against a state official in her official capacity is deemed a suit against the state. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *see also Hafer v. Melo,* 502 U.S. 21, 26 (1991) ("When a state official is sued in an official capacity, the United States Supreme Court has held that the real party in interest is the government entity of which the official is an agent."). Absent a waiver or abrogation of immunity by Congress, the Eleventh Amendment bars a private individual from bringing suit against a state in federal court. U.S. Const. amend. XI. "The Commonwealth of Pennsylvania has not waived its immunity in § 1983 civil rights cases and Congress did not abrogate state immunity in general in enacting civil rights legislation, including § 1983." *O'Hara v. Ind. Univ. of Pa.,* 171 F.Supp.2d 490, 495 (W.D. Pa. 2001). Accordingly, it is respectfully recommended that all claims against the SCI-Smithfield and SCI-Waymart Defendants in their official capacities be dismissed with prejudice as barred by the Eleventh Amendment.

E. STATE LAW CLAIMS

The final three counts of Plaintiff's complaint consist of state law claims asserted against the individual Defendants.[8] The moving Defendants argue that these state law claims against DOC employees should be dismissed on the grounds of state sovereign immunity. (Doc. 13, at 29). Pennsylvania law provides that "the Commonwealth, and its

---

[8] While Court XIII (assault and battery) is asserted only against Martin, Strasburger, James, Brodhead, and Stoney, Counts XIV (intentional infliction of emotional distress) and XV (civil conspiracy) are asserted against all individual Defendants. (Doc. 1, ¶¶ 189-204).

officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Cons. Stat. § 2310. The parties do not assert that any waiver of immunity applies here. Instead, however, Plaintiff alleges that the SCI-Smithfield and SCI-Waymart Defendants are not protected from immunity because their actions fell *outside* the scope of their official duties. (Doc. 18, at 11). Courts generally adopt a three-part test from the Restatement (Second) of Agency to determine whether a Commonwealth employee acts within the scope of employment. *Worth & Co. v. Getzie*, 11 F. Supp. 3d 484, 495 (E.D. Pa. 2014). Specifically,

> [c]onduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits; [and]
> (c) it is actuated, at least in part, by a purpose to serve the master . . . .

> Restatement (Second) of Agency § 228(1).

To overcome Defendants' assertion of state sovereign immunity, Plaintiff must therefore plead facts that could establish that the SCI-Smithfield and SCI-Waymart Defendants' conduct fell outside these parameters. *See Getzie*, 11 F. Supp. 3d at 495; *see also Kull v. Guisse*, 2013 WL 5762235, at *4 n. 5 (Pa. Commw. Ct. Oct. 16, 2013) ("[S]tate employees do not lose their sovereign immunity protection for intentional torts committed within the scope of their employment."). Here, Plaintiff sufficiently states that Martin, Strasburger, James, Brodhead, and Stoney, acted outside the scope of the conduct that they were employed to perform by their unwarranted physical assault on Plaintiff. (Doc. 18, at 14-16 (citing *Robus v. Pennsylvania Dep't of Corr.*, No. CIV A. 04-2175, 2006 WL 2060615, at *3 (E.D. Pa. July 20, 2006) (denying CO immunity on the grounds that CO's alleged

beating of prisoner-plaintiff fell outside the scope of CO's duties))); *see also* Restatement (Second) of Agency § 228(1)(a). However, Plaintiff fails to muster similar arguments in regard to the other SCI-Smithfield and SCI-Waymart Defendants, as the mishandling of grievances, Lear's decision to assign Plaintiff to a cell with Holtzman, Bard's delayed request for medical assistance, and the training and disciplinary practices implemented by the supervisory Defendants all fall within the types of conduct that these Defendants were employed to perform. *See, e.g.*, *Johnson v. Townsend*, 314 F. App'x 436, 440 (3d Cir. 2008) (not precedential) ("[W]e agree with the District Court that defendants . . . were acting within the scope of their employment when handling [plaintiff's] grievances and work assignments."); *Velykis v. Shannon*, No. 1:CV-06-0124, 2006 WL 3098025, at *3 (M.D. Pa. Oct. 30, 2006) ("[Defendants] were acting within the scope of their employment as corrections officers in . . . responding to grievances and supervising subordinates."). Instead, Plaintiff asserts in conclusory fashion that all SCI-Smithfield and SCI-Waymart Defendants "conspired to subject him to that assault or to other harmful and oppressive physical and emotional abuse while knowing of his acute mental illness," without providing any specific detail as to how each individual Defendant's conduct fell outside the scope of employment. (Doc. 18, at 16). This blanket allegation of a conspiracy is insufficient to establish that the remaining SCI-Smithfield and SCI-Waymart Defendants are not entitled to immunity.

It is therefore respectfully recommended that Plaintiff's state law claims against Hollibaugh, Fisher, Whitesel, Oliver, Lear, Bard, Abrashoff, Gavin, and Vinansky be dismissed without prejudice due to state sovereign immunity, but that the state law claims against Martin, Strasburger, James, Brodhead, and Stoney be permitted to proceed.

### F. MOTION FOR A MORE DEFINITE STATEMENT

As a final matter, Defendants move for a more definite statement to require Plaintiff to amend the caption of the complaint to include his full name, rather than just his initials. (Doc. 13, at 27-29). Under Rule 12(e) of the Federal Rules of Civil Procedure, a defendant may move "for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Here, however, Defendants' filings make clear that Plaintiff's failure to include his full name in the title of the complaint has not impeded Defendants' ability to reasonably prepare a response to the complaint. (Doc. 13, at 28 ("The Plaintiff's identity has not been kept confidential. It has been used in official reports within the prison system.")). Because the moving Defendants have been able to determine Plaintiff's identity and respond to the complaint, it is respectfully recommended that Defendants' motion for a more definitive statement be denied.[9] *See Country Classics at Morgan Hill Homeowners' Ass'n, Inc. v. Country Classics at Morgan Hill, LLC*, 780 F. Supp. 2d 367, 372 (E.D. Pa. 2011) (denying motion for a more definite statement where plaintiff failed to use separate counts for each transaction or occurrence as is required under Rule 10(b) because defendants were still able to discern plaintiff's specific allegations and answer each claim).

## IV. LEAVE TO AMEND

The Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an

---

[9] Even though the Court finds that Defendants' motion for a more definite statement is unwarranted, it is nonetheless clear that Plaintiff may not unilaterally proceed under a pseudonym without obtaining leave of court. *See Doe v. Megless*, 654 F.3d 404, 407 (3d Cir. 2011). Plaintiff's failure to do so here is addressed in an Order filed concurrently with this Report and Recommendation.

amendment would be inequitable or futile. *Grayson v. Mayview State Hosp*, 293 F.3d 103, 108 (3d Cir. 2002). In civil rights cases, District Courts are to follow this instruction "even [if] the plaintiff [is] represented by experienced counsel [and] never sought leave to amend." *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000) (citing *Dist. Council 47 v. Bradley*, 795 F.2d 310, 316 (3d Cir. 1986)). As such, it is recommended that Plaintiff be given the opportunity to file an amended complaint that is complete in all respects. The Court does not recommend granting Plaintiff leave to reassert his federal law claims against Whitesel and Oliver, however, as these claims would be futile because Whitesel and Oliver's alleged conduct simply does not rise to the level of a constitutional violation. Likewise, the Court does not recommend granting leave to amend with respect to Count X of Plaintiff's complaint because there is no protected Fourteenth Amendment liberty interest in parole, and with respect to all claims against the SCI-Smithfield and SCI-Waymart Defendants in their official capacities because this Court lacks jurisdiction over those claims pursuant to the Eleventh Amendment.

## V. RECOMMENDATION

Based on the foregoing, it is recommended that:

1. The moving Defendants' motion to dismiss (Doc. 12) Plaintiff's complaint be **GRANTED** in part and **DENIED** in part;

2. The following claims be **DISMISSED WITH PREJUDICE**:

   a. All federal law claims against Deputy Superintendent Whitesel and Corrections Officer Oliver for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6);

   b. Count X of Plaintiff's complaint in its entirety for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6); and

    c.  All claims against the SCI-Smithfield Defendants and the SCI-Waymart Defendants in their official capacities for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

3. The following claims be **DISMISSED WITHOUT PREJUDICE**:

    a.  Plaintiff's supervisory liability claims against Superintendent Gavin and Assistant to the Superintendent Vinansky for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6);

    b.  Plaintiff's Eighth Amendment claims against Corrections Officer Abrashoff for deliberate indifference to a substantial risk of harm and deliberate indifference to a serious medical need, under Counts II and III of the complaint, for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6);

    c.  Plaintiff's conspiracy claims brought under 42 U.S.C. § 1983 in Counts IV and IX, as well as Plaintiff's state law civil conspiracy claim in Count XV, for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6); and

    d.  Plaintiff's state law claims asserted against Assistant to the Superintendent Hollibaugh, Superintendent Fisher, Deputy Superintendent Whitesel, Corrections Officer Oliver, Corrections Officer Lear, Corrections Officer Bard, Corrections Officer Abrashoff, Superintendent Gavin, and Assistant to the Superintendent Vinansky due to state sovereign immunity.

4. Plaintiff be **ALLOWED TO PROCEED** as to all remaining claims alleged in the complaint, including:

    a.  Plaintiff's supervisory liability claims against Superintendent Fisher and Assistant to the Superintendent Hollibaugh;

    b.  Plaintiff's Fourteenth Amendment state-created danger claim and Eighth Amendment deliberate indifference to a substantial risk of harm claim against Corrections Officer Lear;

    c.  Plaintiff's Eighth Amendment deliberate indifference to a serious medical need claim against Corrections Officer Bard;

    d.  Plaintiff's claims against the Department of Corrections under the ADA and the RA in Counts XI and XII of the complaint; and

    e.  Plaintiff's state law claims asserted against Corrections Officers Martin, Strasburger, James, Brodhead, and Stoney in Counts XIII and XIV of the complaint.

5. The moving Defendants' motion for a more definite statement (Doc. 12) be **DENIED**;

6. The Clerk of Court be directed to **TERMINATE** Defendant Nurse Ronald from the caption of this action;

7. Plaintiff be given **THIRTY (30) DAYS** leave to file an amended complaint that is complete in all aspects; and

8. The matter be remanded to the undersigned for further proceedings.


                                        **BY THE COURT:**


Dated: February 1, 2017                 *s/ Karoline Mehalchick*
                                        **KAROLINE MEHALCHICK**
                                        **United States Magistrate Judge**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

R.B.,

        Plaintiff,

    v.

LISA HOLLIBAUGH, et al.,

        Defendants.

CIVIL ACTION NO. 1:16-CV-01075

(KANE, J.)
(MEHALCHICK, M.J.)

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **February 1, 2017**. Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: February 1, 2017**

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**