# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

RYAN J. BLOOM,

               Plaintiff,

    v.

LISA HOLLIBAUGH, et al.,

               Defendants.

CIVIL ACTION NO. 1:16-CV-01075

(MEHALCHICK, M.J.)

## MEMORANDUM

This is a counseled civil rights action, initiated upon the filing of the original complaint in this matter by Plaintiff, Ryan Bloom ("Plaintiff") on June 6, 2016. (Doc. 1). The amended complaint, which stands as the operative pleading in this matter, asserts federal civil rights and state law claims against various employees of the Pennsylvania Department of Corrections ("DOC"), brought in this Court pursuant to 28 U.S.C. § 1331, U.S.C. § 1343, and 28 U.S.C. § 1367. (Doc. 68). Plaintiff's claims arise from his alleged physical and sexual assault while incarcerated at the State Correctional Institutions at Smithfield ("SCI-Smithfield") and Waymart ("SCI-Waymart"). (Doc. 68).

Presently before the Court are three separate motions for summary judgment, filed by the remaining Defendants in this matter. (Doc. 131); (Doc. 136); (Doc. 141). On February 27, 2019, the following Defendants (collectively referred to as the "Corrections Defendants") filed a motion for summary judgment, along with supporting papers: the DOC; Lisa Hollibaugh, Assistant to the Superintendent at SCI-Smithfield; Jay Whitesel, former Deputy Superintendent at SCI-Smithfield; Defendant Oliver, a corrections officer at SCI-Smithfield ("CO Oliver"); Justin Lear, a corrections officer at SCI-Smithfield ("Lt.

Lear"); James Bard, a corrections officer at SCI-Smithfield ("CO Bard"); Defendant Abrashoff, a corrections officer at SCI-Smithfield ("CO Abrashoff"); Wayne Gavin, Superintendent at SCI-Waymart; Joseph J. Vinansky, Assistant to the Superintendent at SCI-Waymart; Defendant Martin, a corrections officer at SCI-Waymart ("Sgt. Martin"); Defendant Strasburger, a corrections officer at SCI-Waymart ("CO Strasburger"); Defendant James, a corrections officer at SCI-Waymart ("CO James"); and Defendant Broadhead, a corrections officer at SCI-Waymart ("CO Broadhead"). (Doc. 131); (Doc. 132); (Doc. 133); (Doc. 134); (Doc. 135). Defendant Fisher, the former Superintendent at SCI-Smithfield, and Defendant Gillmen, a former physician's assistant at SCI-Smithfield ("PA Gillmen"), then respectively filed motions for summary judgment and supporting papers on February 28, 2019. (Doc. 136); (Doc. 137); (Doc. 138); (Doc. 139); (Doc. 141); (Doc. 142); (Doc. 143).

For the reasons stated herein, the Corrections Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**, Defendant Fisher's motion is **GRANTED**, and PA Gillmen's motion is **GRANTED**.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

The events giving rise to this action occurred between June 2014 and September 2014, while Plaintiff was incarcerated at SCI-Smithfield and then at SCI-Waymart. Plaintiff filed the Original Complaint after he was released on parole in May of 2016, and, after a lengthy procedural history, filed the Amended Complaint on June 19, 2017. (Doc. 68).

The amended complaint alleges that Plaintiff, a known gang drop out on the DOC's

---

[1] Due to the voluminous record in this case, the following procedural history focuses on the underlying facts that are relevant to the disposition of the pending motions for summary judgment.

mental health roster, received administrative custody ("AC") status for his own protection while incarcerated at SCI-Smithfield. (Doc. 68, at 6). Based on his AC status, Plaintiff was placed in SCI-Smithfield's restricted housing unit ("RHU"). (Doc. 68, at 6). On June 7, 2014, Lt. Lear ordered that Plaintiff share a cell with another inmate, Michael Holtzman ("Holtzman"). (Doc. 68, at 6). Despite Plaintiff's objections to the cell assignment, and subsequent requests to be moved, Lt. Lear and CO Abrashoff refused to move Plaintiff from the shared cell. (Doc. 6, at 6). Until his move to a new cell on June 11, 2014, Plaintiff endured repeated acts of sexual assault by Holtzman. (Doc. 68, at 10). Plaintiff alleges that he received no medical or psychiatric care in response to the injuries he sustained from Holtzman, and that several Defendants mishandled his related inmate grievances. (Doc. 68, at 10-26).

The amended complaint further alleges that, after attempting to take his own life on July 26, 2014, Plaintiff was transferred to a mental health facility at SCI-Waymart. (Doc. 68, at 27-28). While housed in the therapeutic housing unit at SCI-Waymart, Plaintiff had a verbal altercation with CO Strasburger on September 5, 2014. (Doc. 68, 29). CO Strasburger, along with Sgt. Martin, CO James, and CO Broadhead, then allegedly physically assaulted Plaintiff and proceeded to place him in five-point restraints for approximately sixteen hours. (Doc. 68, at 27-34). Plaintiff attempted to grieve this incident through the DOC grievance system but alleges that Defendants Gavin and Vinasky blocked his grievance from moving forward. (Doc. 68, at 34-35).

Plaintiff also asserts that he was discriminated against and unfairly denied, or limited access to, many aspects of DOC programming because of his mental disability while incarcerated at SCI-Smithfield and SCI-Waymart. (Doc. 68, at 38). These resources

included use of the law library, use of the commissary, educational programming, sports activities, physical exercise, common mealtimes, and a security installed mailbox for sending correspondence and filing prisoner complaints to DOC staff. (Doc. 68, at 38-39). Had the DOC offered him reasonable housing accommodations, medical care, and psychological counseling, Plaintiff claims that he would have been able to participate in DOC programming on equal footing. (Doc. 68, at 39). Plaintiff further alleges the DOC, by and through its agents, discriminated against him on the basis of his mental disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-34, and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 791-94g. (Doc. 68, at 39).

At this stage of litigation, the following claims in the Amended Complaint remain:

- A Deliberate Indifference to Imminent Harm and Failure to Protect Claim brought under the Eighth Amendment against Lt. Lear and CO Abrashoff (Count II);

- A Deliberate Indifference to Serious Medical Needs Claim brought under the Eighth Amendment against CO Bard, CO Abrashoff, and PA Gillmen (Count III);

- An Excessive Use of Force claim brought under the Eighth Amendment against Sgt. Martin, CO Strasburger, CO James, and CO Broadhead (Count V);

- A Failure to Intervene Claim brought under the Eighth Amendment against Sgt. Martin, CO Strasburger, CO James, and CO Broadhead (Count VI);

- A Deliberate Indifference to Imminent Harm and failure to Protect claim brought under the Eighth Amendment against Sgt. Martin, CO Strasburger, CO James, and CO Broadhead (Count VII);

- A Deliberate Indifference to Serious Medical Needs Claim brought under the Eighth Amendment against Gavin, Vinansky, Sgt. Martin, CO Strasburger, CO James, and CO Broadhead (Count VIII);

- A Denial of Programs and Services because of Disability claim brought under the ADA and RA against the DOC (Count XI);

- A Discrimination because of Disability claim brought under the ADA and RA against the DOC (Count XII)

- A state law Assault and Battery Claim brought against Sgt. Martin, CO Strasburger, CO James, and CO Broadhead (Count XIII); and
- A state law Intentional Infliction of Emotional Distress ("IIED") Claim brought against all individual Defendants (Count XIV)

(Doc. 68, at 42-52).

As for relief, Plaintiff seeks compensatory and punitive damages, declaratory relief, and injunctive relief. (Doc. 68, at 54).

On February 27, 2019, the Corrections Defendants filed a motion for summary judgment (Doc. 131), along with a supporting brief (Doc. 133), a statement of material facts (Doc. 132), and exhibits. (Doc. 134); (Doc. 135). After receiving an extension of time, Plaintiff filed a brief in opposition (Doc. 155) and an answer to the Corrections Defendants' statement of material facts (Doc. 154) on April 22, 2019. The Corrections Defendants then filed a reply brief and supplemental exhibits on May 6, 2019. (Doc. 158); (Doc. 159).

Defendant Fisher then filed a motion for summary judgment (Doc. 136), along with a supporting brief (Doc. 138), a statement of material facts (Doc. 137), and exhibits (Doc. 19), on February 28, 2019. Plaintiff filed his brief in opposition (Doc. 149) and answer to Defendants Fisher's statement of material facts (Doc. 148) on April 21, 2019. Plaintiff additionally filed several supporting exhibits on April 21, 2019. (Doc. 150); (Doc. 151); (Doc. 152); (Doc. 153). Defendant Fisher filed a reply brief on May 6, 2019. (Doc. 161).

PA Gillen also filed a motion for summary judgment (Doc. 141), along with supporting papers (Doc. 143); (Doc. 143), on February 28, 2019. Plaintiff filed a brief in opposition (Doc. 143) and his answer to PA Gillmen's Statement of Material Facts (Doc. 156) on April 22, 2019. Defendant Gillmen filed a reply brief in May 6, 2019 (Doc. 160), to which Plaintiff filed a sur-reply on June 4, 2019. (Doc. 166).

Having been fully briefed, Defendants' motions are ripe for disposition.

## II. SUMMARY OF MATERIAL FACTS[2]

### A. FACTS REGARDING THE EVENTS AT SCI-SMITHFIELD

Plaintiff was formerly incarcerated at SCI-Smithfield from April 28, 2014 through August 28, 2014. (Doc. 132, at 9, ¶ 33). The RHU at SCI-Smithfield, also known as the "K" Block, housed inmates in administrative custody and disciplinary custody. (Doc. 132, at 14, ¶ 49). According to Plaintiff's cell history, he was housed in the RHU from May 12, 2014 to June 18, 2014 due to his administrative custody status. (Doc. 150-1, at 2-3); (Doc. 154, at 14, 75). During this time, Lt. Lear, CO Abrashoff, and CO Bard worked as correctional officers assigned to the K Block. (Doc. 132, at 14, ¶ 49); (Doc. 132, at 20, ¶ 72); (Doc. 132, at 23, ¶ 84).

The majority of inmates housed in the RHU are placed in single cells. (Doc. 132, at 14, ¶ 49). On June 6, 2014, however, Lt. Lear informed Plaintiff that he was being moved into a cell with Holtzman. (Doc. 132, at 23, ¶ 85). The receipt of new inmates into the RHU, and resulting need for additional bed space, prompted Plaintiff's cell assignment with Holtzman. (Doc. 132, at 23, ¶ 85). Although Plaintiff initially refused to move into the cell, Lt. Lear indicated that Plaintiff would receive a misconduct if he failed to comply with the re-assignment order. (Doc. 132, at 23, ¶ 85).

Plaintiff submits that he showed Lt. Lear his Form DC-141, which indicated that he could not receive any cellmates, upon being told to cell with Holtzman. (Doc. 154, at 16, ¶ 86). Nonetheless, the Parties dispute whether Lt. Lear located any such substantiating

---

[2] Unless otherwise indicated, the facts provided below are taken from the Parties' statement of material facts, responses thereto, and supporting exhibits. (Doc. 132); (Doc. 134); (Doc. 135); (Doc. 137); (Doc. 139); (Doc. 142); (Doc. 148); (Doc. 150); (Doc. 151); (Doc. 152); (Doc. 153); (Doc. 154); (Doc. 156).

documentation when he ordered Plaintiff to move. (Doc. 132, at 24, ¶ 86); (Doc. 154, at 16, ¶ 86). Lt. Lear contends that he contacted the Security Office regarding any concerns with celling Plaintiff and Holtzman together, but that the Security Office found none. (Doc. 132, at 24, ¶ 86). As such, Plaintiff moved into the same cell as Holtzman. (Doc. 132, at 24, ¶ 86). Plaintiff claims that Holtzman proceeded to sexually assault him in their cell between June 8, 2014 and June 11, 2014, once he was moved to a different cell. (Doc. 142, at 1, ¶ 1).

Lt. Lear did not believe that celling Plaintiff with Holtzman posed a serious risk of harm to him. (Doc. 132, at 25, ¶ 93). Plaintiff disputes this fact, however, and asserts that Holtzman had threatened to kill Lt. Lear—a threat of which Lt. Lear was purportedly aware—a few days prior to ordering the June 6, 2014 cell assignment. (Doc. 154, at 17, ¶ 81). Plaintiff further submits that Holtzman yelled loudly that he would kill any cellmate Lt. Lear assigned to his cell. (Doc. 154, at 18, ¶ 93). In addition, Plaintiff highlights that he was incarcerated at SCI-Smithfield for a non-violent offense, whereas Holtzman had a long history of violent misconducts. (Doc. 154, at 17-18, ¶ 93).

It is undisputed that CO Abrashoff and CO Bard had no input in the decision to cell Plaintiff with Holtzman. (Doc. 132, at 15, ¶ 50); (Doc. 132, at 21, ¶ 74). The Parties dispute, however, whether Plaintiff asked for CO Abrashoff's help after his placement in the cell with Holtzman. (Doc. 132, at 21, ¶ 75); (Doc. 154, at 15, ¶ 75). According to Plaintiff, he asked CO Abrashoff to remove him upon fearing that Holtzman would harm him, but that CO Abrashoff declined to assist him. (Doc. 154, at 14, ¶ 75). Plaintiff did not inform CO Abrashoff of the alleged rape, of which CO Abrashoff only became aware upon the initiation of the related investigation days after the incident. (Doc. 132, at 21, ¶ 76). Plaintiff also did not inform Lt. Lear that Holtzman had threatened him after being placed in the

cell. (Doc. 132, at 24, ¶ 89). Plaintiff nonetheless indicates that he did not further report his concerns because Holtzman had threatened to harm him if he did. (Doc. 154, at 17, ¶ 89).

On June 11, 2014, Plaintiff was removed from the cell with Holtzman and placed in another cell in the RHU. (Doc. 132, at 15, ¶ 50). On June 17, 2014, CO Bard indicates that Plaintiff told him that something had happened without specifying what. (Doc. 132, at 15, ¶ 52). Plaintiff disputes this notion, and contends that he gave CO Bard a sick-call slip and further informed him of Holtzman's sexual assault. (Doc. 154, at 9, ¶ 52). CO Bard subsequently took Plaintiff's sick call slip to the on-duty shift commander, who then directed CO Bard to call the medical department. (Doc. 132, at 15, ¶ 53). Plaintiff wanted to speak with a nurse privately, and approximately three hours passed before a nurse arrived. (Doc. 154, at 9-10, 53). Plaintiff asserts that the nurse did not provide him with any medical treatment at that time. (Doc. 154, at 10, ¶ 53).

On June 18, 2014, Physician's Assistant Vincent Capone ("PA Capone") saw Plaintiff. (Doc. 142, at 2, ¶ 3). PA Capone noted that Plaintiff would not initially talk to him, but eventually came to his cell door and reported that he was fine but experienced rectal bleeding the day before. (Doc. 142, at 2, ¶ 3). PA Capone also noted that Plaintiff then held up a note on which he wrote that he had been raped. (Doc. 142, at 2, ¶ 3). PA Capone immediately reported the contents of this note to the RHU lieutenant, to which CO Abershoff responded that Plaintiff's statement was already under investigation. (Doc. 142, at 2, ¶ 3). Thereafter, Plaintiff was transferred to a Psychiatric Observation Cell ("POC") in the infirmary. (Doc 132, at 16, ¶ 54).

On June 20, 2014, PA Gillmen saw Plaintiff in the POC cell to follow up on his claims of a small amount of rectal bleeding. (Doc. 142, at 3, ¶ 4). PA Gillmen assessed that

his problems had resolved, and that no action was required at that time. (Doc. 142, at 3, ¶ 4). Plaintiff, however, states that PA Gillmen merely communicated with him through closed doors and did not examine, or otherwise provide treatment for, him. (Doc. 156, at 2, ¶ 4). Plaintiff also asserts that he attempted to file grievances while confined in the POC, but that Defendant Fisher, amongst others, tampered with the grievance process at SCI-Smithfield. (Doc. 148, at 3, ¶ 30). Plaintiff eventually returned back to a cell in the RHU on July 23, 2014. (Doc. 156, at 2, ¶ 5).

Plaintiff's allegations of sexual assault were referred to SCI-Smithfield's Security Office and subsequently investigated. (Doc. 132, at 18, ¶ 65). On June 18, 2014, the State Police interviewed Plaintiff before he was moved to the POC. (Doc. 154, at 10, ¶ 54). In a memo dated June 4, 2015, the Security Office concluded that Plaintiff's allegations against Holtzman were unsubstantiated. (Doc. 132, at 18, ¶ 64). Plaintiff disputes this fact insofar as it implies that the State Police determined he had fabricated Holtzman's attack. (Doc. 154, at 11-12, ¶ 65).

B. FACTS REGARDING THE EVENTS AT SCI-WAYMART

The facts regarding Plaintiff's alleged assault by prison staff at SCI-Waymart on September 5, 2015 are relatively sparse. Defendant Gavin contends that he did not have any involvement in the day-to-day operations of the individual housing units at SCI-Waymart, and that the officers involved in the alleged use of force—Sgt. Martin, CO Strasburger, CO James and CO Broadhead—did not report to him. (Doc. 132, at 26-27, ¶¶ 95, 98). Both Defendants Gavin and Vinansky (collectively, the "Supervisory Defendants") assert that they were not responsible for staffing the Forensic Treatment Unit where Plaintiff was housed. (Doc. 132, at 27, ¶ 99); (Doc. 132, at 32, ¶ 115). Additionally, the Supervisory

Defendants claim that they did not supervise SCI-Waymart's mental health or medical department staff. (Doc. 132, at 28, ¶ 102); (Doc. 132, at 32, ¶ 116).

The Supervisory Defendants also submit that they did not tolerate profanity, bigotry or the use of hate language by SCI-Waymart staff. (Doc. 132, at 28, ¶ 103); (Doc. 132, at 33, ¶ 117). Nor did Defendants Gavin and Vinansky purportedly condone the mistreatment of inmates or the improper use of restraints by staff. (Doc. 132, at 28, ¶ 104); (Doc. 132, at 33, ¶ 118). Plaintiff disputes these facts, however, insofar as his grievances regarding the "racially motivated violence" he endured were either diverted or not processed while at SCI-Waymart. (Doc. 154, at 18, ¶¶ 103-04). Similarly, Plaintiff disputes that Defendant Vinansky, the grievance coordinator at SCI-Waymart, properly recorded and processed his inmate grievances. (Doc. 154, at 19, ¶ 106).

## III.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251–52. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990); *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F.Supp.2d 490, 493 (E.D. Pa. 2010) (finding that "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## IV. DISCUSSION

### A. SECTION 1983 CLAIMS

Plaintiff's complaint asserts federal civil rights claims brought pursuant to 42 U.S.C. § 1983. § 1983 provides a private cause of action with respect to violations of federal

constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

§ 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, a plaintiff must establish that a defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). The Eighth Amendment protections that Plaintiff invokes are incorporated against state actors through the substantive due process clause of the Fourteenth Amendment. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947).

### B. ADMINISTRATIVE EXHAUSTION

The Corrections Defendants argue summary judgment as to the Eight Amendment Excessive Use of Force claims should be granted on the sole basis of Plaintiff's failure to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"). (Doc. 133, at 12-15). Specifically, the Corrections Defendants contend that Plaintiff did not appeal grievance number 527853 ("Grievance No. 527853"), pertaining to his alleged assault by prison staff at SCI-Waymart, to final review. (Doc. 133, at 13-14). The Corrections Defendants additionally assert that Plaintiff did not file any grievances complaining of his alleged placement in four or five-point restraints following the incident at SCI-Waymart. (Doc. 133, at 14). The Corrections Defendants also claim that Plaintiff failed

to exhaust his ADA claims pursuant to DOC Department Policy DC-ADM 006 ("DC-ADM 006"). (Doc. 133, at 15).

In response, Plaintiff argues that the PLRA's exhaustion bar only applies to suits brought by prisoners, and that the Corrections Defendants failed to establish that he was a prisoner upon filing the instant lawsuit on June 6, 2016. (Doc. 155, at 10). Plaintiff further submits that he did not receive notice of the initial review response to Grievance No. 527853, and that Defendants Vinansky and Gavin did not respond to the request for a status update he sent to them on November 5, 2014. (Doc. 155, at 10-11). In addition, Plaintiff argues that his placement in five-point restraints falls within the compass of Grievance No. 527853. (Doc. 155, at 11). Moreover, Plaintiff contends that DC-ADM 006 does not provide any administrative remedy regarding his disability claims brought under the ADA. (Doc. 155, at 11).

As a preliminary matter, the Court considers whether Plaintiff is bound by the exhaustion requirements of the PLRA. The PLRA provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by *a prisoner confined in any* jail, prison, or *other correctional facility* until such administrative remedies as are available are exhausted.

42 U.S.C.A. § 1997e(a) (emphasis added)

The statute further defines the term "prisoner" as:

> [A]ny person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

42 U.S.C.A. § 1997e(h).

The United States Court of Appeals for the Third Circuit has held, however, that the PLRA does not extend to former prisoners who have timely initiated lawsuits about prison conditions post-release. *Ahmed v. Dragovich*, 297 F.3d 201, 210 (3d Cir. 2002) ("Although [plaintiff] would have been free of the strictures of the PLRA if he had filed a timely complaint after his release from prison, he is bound by the PLRA because he suit was filed . . . almost three years before he was released from prison."); *accord Dawson v. Cook*, 238 F. Supp. 3d 712, 718 (E.D. Pa. 2017) ("[W]here a prisoner is released prior to filing a lawsuit, he need not meet the exhaustion requirement for suits based on prison conditions that occurred prior to his release."); *Monk v. Williams*, 516 F. Supp. 2d 343, 350 (D. Del. 2007) ("The PLRA exhaustion requirement does not apply to prisoners who file a timely complaint after release from prison, but does apply to prisoners who file a complaint while in prison and are subsequently released."). Indeed, "[a]ny other view would [] be inconsistent with the spirit of the PLRA, which was designed to deter frivolous litigations by idle prisoners." *Ahmed*, 297 F.3d at 210.

Based on the Parties' arguments, at issue is whether Plaintiff qualified as a "a prisoner confined in any jail, prison, or other correctional facility" when he initiated the instant action on June 6, 2016. (Doc. 1). "[A] plaintiff's status as a prisoner for purposes of the PLRA is judged as of the time he files his original complaint." *Defreitas v. Montgomery County Correctional Facility*, 525 F. App'x 170, 176 (3d Cir. May 7, 2013); *see also Ahmed*, 297 F.3d at 210 n.10 (noting that the PLRA's exhaustion requirement applies "only if the plaintiff is a prisoner at the time of filing." (quoting *Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001))). Here, Plaintiff's cell history reveals that he was paroled on May 26, 2016,

but then subsequently returned to prison on September 15, 2016.[3] (Doc. 150-1, at 1). As such, it is evident that Plaintiff filed this lawsuit during his intermittent period of release while on parole. (Doc. 155, at 10).

The Corrections Defendants, however, point to the declaration of Eileen Culkin, an employee of the Pennsylvania Board of Probation and Parole (the "Culkin Declaration"), in support of summary judgment. The Culkin Declaration states that Plaintiff was paroled from DOC custody to the Cumberland County Parole Violator Center on May 26, 2016, and then transferred to the Columbia County Parole Violator Center on May 31, 2016. (Doc. 159, at 5). Plaintiff was then released to a Community Corrections Center on July 9, 2016. (Doc. 159, at 5). As such, the Culkin Declaration concludes that Plaintiff was still "incarcerated" on June 6, 2016 because his freedom of movement was limited between May 26, 2016 and July 9, 2016. (Doc. 159, at 5). Nonetheless, the Corrections Defendants do not point to any evidence regarding the nature of such Parole Violator Centers, or the ways in which Plaintiff's liberties were restrained upon being paroled there.

The Corrections Defendants further contend that the PLRA's exhaustion requirement extends to individuals "who are incarcerated in drug treatment centers, halfway houses, and other similar facilities." (Doc. 158, at 5). In support of this argument, the Corrections Defendants cite to several cases from other courts, including *Ruggiero v. County of Orange*, 467 F.3d 170 (2d Cir. 2006), *Witze v. Femal*, 376 F.3d 744 (7th Cir. 2004), and *Nicholas v. McLaughlin*, No. 07-324, 2008 WL 509090 (W.D. Pa. Feb. 21, 2008). Notably, the

---

[3] As of May 26, 2016, Plaintiff's cell history record lists his sentence status as "paroled," with a corresponding parole status of "no recommit action." (Doc. 150-1).

Corrections Defendants do not direct the Court to any binding authority[4] from within this Circuit that stands for the proposition that "other correctional facili[ties]," as contemplated under the PLRA, include Parole Violator Centers. Further, even if the Court accepted the Corrections Defendants' proposition—that the location Plaintiff was paroled to was akin to another prison facility—it is unclear how this would reconcile with the purposes of the PLRA as there is no evidence regarding whether such a facility provided available mechanisms under which inmates could exhaust their administrative remedies. *Cf. Warren v. King*, No. 14-CV-6249, 2016 WL 1720424, at *2 (E.D. Pa. Apr. 29, 2016) (denying summary judgment on exhaustion grounds when it was unclear from the record whether the grievance procedures at "a facility that provide[d] residential reentry treatment services and house[d] Technical Parole Violators" were available to plaintiff, a former resident of this facility who did not have an opportunity to file a grievance pursuant to its existing administrative exhaustion mechanisms). Thus, considering the dearth of binding authority from within this Circuit, as well as the evidence submitted by the Parties, the Court finds that the Corrections Defendants have not shown that Plaintiff was incarcerated for the purposes of the PLRA on the date he filed this action.

---

[4] The Court notes that the Corrections Defendants only cite to one binding case from this Circuit in support of their argument. (Doc. 158, at 5). Specifically, the Corrections Defendants cite to the Third Circuit's decision in *Ahmed v. Dragovich*, which found that the PLRA applied to actions brought by inmates while they were incarcerated. 297 F.3d, 201, 210 (3d Cir. 2002). In an apparent effort to cure the District Court's dismissal of his complaint on exhaustion grounds, the plaintiff in *Ahmed*, unlike the Plaintiff here, sought leave to amend his complaint to reflect that he had been released from prison since initiating his lawsuit. *Ahmed*, 297 F.3d at 210. The *Ahmed* court upheld the denial of his request as futile, however, and reasoned that the plaintiff was still "bound by the PLRA because his suit was filed . . . almost three years *before* he was released from prison." *Ahmed*, 297 F.3d at 210 (emphasis added). Accordingly, to the extent that the Corrections Defendants rely on *Ahmed* for the proposition that Plaintiff was still incarcerated when he brought this action, the Court is not persuaded.

Accordingly, the Court finds that the Corrections Defendants are not entitled to summary judgment as to Plaintiff's Excessive Use of Force Claims[5] (Count V) and ADA Claims (Counts XI and XII) on exhaustion grounds under the PLRA.

## C. FAILURE TO PROTECT CLAIMS – COUNTS II AND VII

In the amended complaint, Plaintiff advances several failure to protect claims under the Eighth Amendment. The Eighth Amendment protects prisoners from being subjected to cruel and unusual punishment. U.S. CONST. AMEND. VIII. Here, Plaintiff alleges that Lt. Bard, CO Abrashoff, Sgt. Martin, CO Strasburger, CO James and CO Broadhead failed in their "duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To prevail on any Eighth Amendment claim, an inmate must meet both an objective and subjective requirement: (1) the alleged deprivation must be sufficiently serious; and (2) the defendant official must have "a sufficiently culpable state of mind." *See Farmer*, 511 U.S. at 834. Further, to survive summary judgment on a failure to protect claim brought under the Eighth Amendment, a plaintiff must demonstrate that: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3)

---

[5] Although not addressed in the Corrections Defendants' motion for summary judgment, the Court recognizes that Plaintiff's Eighth Amendment Failure to Intervene Claim asserted in Count VI remains. (Doc. 68, at 46-47). It is well settled that "a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). However, "[alt]hough legally distinct, the fate of plaintiff's failure to intervene claim is closely linked to that of [the] excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene." *Lora-Pena v. Denney*, 760 F. Supp. 2d 458, 468 (D. Del. 2011) (citations omitted). Here, as summary judgment is denied as to Plaintiff's excessive force claim on the grounds of exhaustion, the Court notes that Plaintiff's failure to intervene claim also survives.

the official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012); *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).

A prison official acts with a sufficiently culpable state of mind where the official displays deliberate indifference to the inmate's safety by recklessly disregarding a known and substantial risk of harm to the inmate. *Farmer*, 511 U.S. at 836. This can be established by "circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2011) (citing *Farmer*, 511 U.S. at 842); *see also Hamilton*, 117 F.3d at 747 ("A prison official's knowledge of a substantial risk is a question of fact and can, of course, be proved by circumstantial evidence."). However, a prison official does not violate the Eighth Amendment's proscription of cruel and unusual punishment by failing "to alleviate a significant risk that he should have perceived but did not . . . ." *Farmer*, 511 U.S. at 838; *see also Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986) (a prison official's negligent conduct that results in injury inflicted by an inmate on another inmate does not amount to a constitutional violation under the Eighth Amendment). Further, a defendant may rebut a prima facie claim of deliberate indifference by "establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." *Beers-Capitol*, 256 F.3d at 133; *Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause.").

### 1. Claims against Lt. Lear

In Count II, Plaintiff alleges that Lt. Lear displayed deliberate indifference by ordering him to move into a cell with Holtzman, despite knowing that it would be highly

dangerous. (Doc. 68, at 42). The Corrections Defendants argue they are entitled to summary judgment, as Lt. Lear was unaware of any reason why Plaintiff and Holtzman should not be celled together. (Doc. 133, at 20). Notably, the Corrections Defendants do not appear to challenge the objective component of whether Plaintiff was incarcerated under conditions posing a substantial risk of harm. (Doc. 133, at 17-20). Rather, they assert that Plaintiff cannot meet the subjective deliberate indifferent prong of a failure to protect claim. (Doc. 133, at 19-20).

In support of summary judgment, the Corrections Defendants point to the Declaration Lt. Lear (the "Lear Declaration"). (Doc. 135, at 88-91). Therein, Lt. Lear states that he could not locate any documentation that supported Plaintiff's contention he was not to receive any cellmates. (Doc. 135, at 89). Lt. Lear affirms that he also contacted the Security Office to ascertain whether celling Plaintiff with Holtzman would present any issues, but that the Security Office did not see any concerns. (Doc. 135, at 89). Additionally, Lt. Lear declares that he was unaware of any threats made by Holtzman towards Plaintiff, unaware of whether Plaintiff was, or had formerly been, a gang member and did not think that Plaintiff was at high risk of victimization. (Doc. 135, at 89). Lt. Lear further asserts that Plaintiff never informed him that Holtzman had threatened him after the cell assignment. (Doc. 135, at 90).

In response, Plaintiff points to a Form DC-141 Part III that indicates he received administrative custody status and was granted self-confinement. (Doc. 150-3, at 2); (Doc. 152-9). A review of this form reveals that Plaintiff requested self-confinement at SCI-Smithfield due to problems stemming from his previous association with a "STG," or a security threat group. (Doc. 152-9). The form also notes Plaintiff's D score in connection

with his mental health diagnosis. (Doc. 152-9). The Program Review Committee granted Plaintiff's request on April 24, 2014 and continued him on administrative custody status until July 10, 2014, the date of his next 90-day review. (Doc. 152-9).

In his declaration, Plaintiff also asserts that he showed this form to Lt. Lear upon being ordered to move into the cell with Holtzman. (Doc. 150-3, at 2). Plaintiff stated that he carried this form on his person, and that Lt. Lear also had ready access to his records. (Doc. 150-2, at 28); (Doc. 155, at 20). Plaintiff additionally points to his deposition testimony, during which he testified to the following:

> A:  That date, Lieutenant Lear and a couple of the other security staff had did an investigation out in general population. They needed room to house the other inmates that they were bringing to the RHU. Lieutenant Lear had went to numerous cells to get people to cell up with each other, whether they were on DC status or AC status. And basically everyone refused to move into people's cells.
>
> I was up for parole in August. Lieutenant Lear came to my cell, told me I needed to move. I showed him my PRC Statement or showing him that I had been granted self-confinement. I was to be housed alone. And he threatened to give me a DC-141. And I was told that it would have only been for a few days and not to take Mr. Holtzman serious. And I told him I still did not feel comfortable moving into that cell, and I ended up getting moved in the cell anyways.
>
> . . .
>
> I told [Lt. Lear] that I didn't feel comfortable moving into that cell because of my current situation with the gang involvement and how [Holtzman] acts towards guards and other inmates. I didn't feel safe going in there. And he had just threatened to kill [Lt. Lear] and kill anybody that you put in the cell.
>
> Q.  When did [Holtzman] say that?
>
> A.  The very day that they had moved me and prior to me moving into that cell.

(Doc. 150-2, at 27-29).

Based on the evidence presented, summary judgment is inappropriate here. Specifically, a reasonable juror could believe Plaintiff's version of the events—in which he showed Lt. Lear that he required single cell status based on his former gang affiliation and mental health status, as outlined in the form DC-141 Part III—or Lt. Lear's, in which he neither saw nor discovered any such form upon celling Plaintiff with Holtzman. As such, a material question of fact exists as to whether Lt. Lear had notice of the danger posed to Plaintiff by placing him in a cell with Holtzman in the RHU, and whether he disregarded that threat. Accordingly, the Court denies summary judgment against Lt. Lear with respect to Plaintiff's failure to protect claim asserted in Count II.

### 2. Claims against CO Abrashoff

As to CO Abrashoff, Plaintiff argues that he refused to act upon his specific requests for assistance after being celled with Holtzman. (Doc. 68, at 42). Specifically, Plaintiff claims that CO Abrashoff failed to protect him from the harm posed by Holtzman when he declined to remove him from their shared cell. (Doc. 68, at 42). The Corrections Defendants, however, assert that CO Abrashoff had no personal involvement in the decision to place Plaintiff in a cell with Holtzman. (Doc. 135, at 84). The Corrections Defendants also argue that CO Abrashoff did not learn of Plaintiff's allegations against Holtzman until an investigation was started days after the incident. (Doc. 133, at 17).

According to CO Abrashoff's declaration provided by the Corrections Defendants, Plaintiff neither asked him to be moved out of the cell with Holtzman nor complained to him about Holtzman. (Doc. 135, at 84). Rather, CO Abrashoff declares that he understood Plaintiff and Holtzman got along. (Doc. 135, at 84). Further, CO Abrashoff states that he was not aware of any threat to Plaintiff posed by the cell assignment, or any reason why

Plaintiff and Holtzman could not be celled together. (Doc. 135, at 84). CO Abrashoff additionally avers that Plaintiff never informed him that Holtzman had committed a sexual assault, and only learned of the alleged event several days after the fact. (Doc. 135, at 84).

In Plaintiff's declaration, however, he avers that he asked CO Abrashoff to help him on an unspecified occasion and explained his fears about being celled with Holtzman. (Doc. 150-3, at 2). Plaintiff further testified during his deposition as follows:

> Q:     Why do you say [CO Abrashoff] knew you were on the mental health roster?
>
> A.     I wouldn't know if he would or not, but they go into our PRC meetings with the staff superintendent. Well, sometimes that person's there, but it's normally Deputy Treatment, deputy Program, Security, someone from the security office, a counselor and a psychologist in there. And they always refer to what your custody level is, what your mental health roster is, about your medications, are you compliant, is there anything that they could do to help you. And then they review you every so often.

(Doc. 150-2, at 56).

However, even when construed in the light most favorable to Plaintiff, there is insufficient evidence to establish that CO Abrashoff possessed the requisite subjective knowledge to give rise to a constitutional violation. Specifically, Plaintiff does not show that he asked CO Abrashoff to move him from his cell on more than one occasion, that his reported fear of harm was sufficient to put CO Abrashoff on notice of a threat, or that CO Abrashoff affirmatively knew of Plaintiff's Form DC-141 or his and Holtzman's purported status on the mental health roster. *See, e.g.,* Blackstone v. Thompson, 568 F. App'x 82, 84–85 (3d Cir. 2014) (no liability where plaintiff "had just one communication" with prison official, in which Plaintiff "stated that he was not 'getting along' and did not 'feel comfortable' with his cellmate"); *Wise v. Ranck*, 340 F. App'x 765, 766 (3d Cir. 2009)

(noting that while it may have been wise to separate two cellmates based on ones allegations that he feared an attack by the other, "threats between inmates are common and do not always serve to impute actual knowledge of a substantial risk of harm") (quoting *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir. 1998)). While CO Abrashoff's conduct may have perhaps amounted to negligence, a reasonable juror could not find that he was deliberately indifferent to a serious risk of harm. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (holding no deliberate indifference when an official fails "to alleviate a significant risk that he should have perceived but did not . . . ."); *see also Davidson v. Cannon,* 474 U.S. 344, 347–48 (1986) (a prison official's negligent conduct that results in injury inflicted by an inmate on another inmate does not amount to a constitutional violation under the Eighth Amendment).

For this reason, the Corrections Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's failure to protect claim asserted against CO Abrashoff.

### 3. Claims against Sgt. Martin, CO Strasburger, CO James and CO Broadhead

The Corrections Defendants further argue that summary judgment is warranted as to Count VII under the more specific provision rule. (Doc. 133, at 20). Specifically, Count VII asserts that Sgt. Martin, CO Strasburger, CO James and CO Broadhead failed to protect Plaintiff from the injury they inflicted upon him at SCI-Waymart. (Doc. 68, at 47). However, the Corrections Defendants contend that, since Plaintiff also brings an excessive use of force claim in connection with the alleged beating at SCI-Waymart, the more specific provision rule applies. (Doc. 133, at 20). Plaintiff nonetheless argues that the evidence presented supports deliberate indifference claims. (Doc. 155, at 21).

Under the more specific provision rule articulated in *Graham v. Connor*, 490 U.S. 386 (1989), "if a constitutional claim is covered by a specific constitutional provision, such as

the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n.7 (1997); *cf. County of Sacramento v. Lewis,* 523 U.S. 833, 843 (1998) (declining to apply the more specific provision rule to substantive due process claim when facts arising from high speed police chase did not fall under the Fourth Amendment's search and seizure protections). Here, however, Plaintiff has not raised a Fourteenth Amendment substantive due process claim that may be foreclosed by this rule. Rather, Plaintiff appears to invoke two separate theories of Eighth Amendment liability based on the same operative facts. Nonetheless, insofar as the Corrections Defendants seek summary judgment as to Count VII under the more specific provision rule, the Court declines to enter judgment in their favor.

D. DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS CLAIMS – COUNTS III AND VIII

Plaintiff also advances Eighth Amendment claims for deliberate indifference to his serious medical needs against CO Bard, CO Abrashoff, PA Gillmen, the Supervisory Defendants, Sgt. Martin, CO Strasburger, CO James, and CO Broadhead. (Doc. 68, at 43-44, 48-49). The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain," which includes "deliberate indifference to serious medical needs of prisoners." *Dennis v. Jensen*, No. 10–1486, 2013 WL 2245144, at *3 (M.D. Pa. May 20, 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)). Such a claim requires that a plaintiff allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978) ("This standard is two-pronged.

It requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious.").

A serious medical need exists if the failure to treat a medical condition "may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle*, 429 U.S. at 103. Further, to meet the deliberate indifference standard, it must be shown that an official knowingly disregarded an excessive medical risk: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Deliberate indifference may be manifested by an "intentional refusal to provide medical care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury." *Beckett v. Dep't. of Corr.*, No. 10–0050, 2011 WL 4830787, at *11 (M.D. Pa. Oct.12, 2011). Nonetheless, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)).

### 1. Claims against CO Bard and CO Abrashoff

With respect to the events at SCI-Smithfield, Plaintiff brings an Eighth Amendment medical needs claim against CO Bard and CO Abrashoff. Specifically, Plaintiff argues that CO Bard and CO Abrashoff failed to facilitate prompt medical treatment upon discovering his reports of rape, or otherwise follow up to ensure he received medical care. (Doc. 155, at 17-19). The Corrections Defendants assert that CO Bard and CO Abrashoff, as non-medical professionals, were entitled to rely on the judgment of the doctors that saw Plaintiff in

response to his allegations of sexual assault. (Doc. 133, at 20). They further assert that neither CO Bard nor CO Abrashoff took any steps to deny or interfere in Plaintiff's medical care at SCI-Smithfield. (Doc. 133, at 21).

In support of summary judgment, the Corrections Defendants point to Plaintiff's treatment records showing that he was seen by a physician's assistant within hours of reporting his rape to CO Bard. (Doc. 133, at 21). They also cite to the declaration of CO Bard, which states that Plaintiff first informed him something happened on June 17, 2014. (Doc. 135, at 94). According to CO Bard, Plaintiff provided him with a sick call slip which partially indicated that he was scared. (Doc. 135, at 94). CO Bard emphasizes that this note, however, did not state that Plaintiff was raped by Holtzman or otherwise in pain. (Doc. 135, at 94). A review of the sick call slip reveals that Plaintiff presented the following written statement to CO Bard:

> I need to speak to someone. Something happen[ed] to me about a week [and] a half ago, [and] my stomach is hurting bad [and] when I use the bathroom sometimes there is blood. I didn't say anything sooner because I'm scared. If I say something I'm [going to] get hurt. I also wrote my family a letter. Please keep this info[rmation] safe [and] don't let everyone know, I don't want this to spread in the jail. I'm already embarrassed enough.

(Doc. 135, at 97).

Once CO Bard received the sick call slip, he claims that he gave it to the Shift Commander and, pursuant to his superior's suggestion, subsequently called the medical department. Plaintiff does not dispute that CO Abrashoff was not involved in the healthcare provided to him at SCI-Smithfield, but disputes whether the treatment he received after reporting the rape was prompt. (Doc. 154, at 14).

Based on the record before the Court, Plaintiff's claims against CO Bard and CO Abrashoff as non-medical defendants do not survive summary judgment. Specifically,

insofar as Plaintiff complains that these defendants may have provided delayed medical treatment, he does not provide evidence that establishes it was due to non-medical reasons. *See Beckett v. Dep't. of Corr.*, No. 10–0050, 2011 WL 4830787, at *11 (M.D. Pa. Oct.12, 2011). Nor does Plaintiff's dissatisfaction with the treatment he received mean that CO Bard and CO Abrashoff interfered with the implementation of the same, as the record establishes that PA Capone saw Plaintiff the same day he reported his concerns to CO Bard in the sick-call slip. Accordingly, no dispute of material fact exists as to whether the non-medical defendants at SCI-Smithfield acted with deliberate indifference in response to Plaintiff's allegations of sexual assault.

For these reasons, the Corrections Defendants motion for summary judgement is **GRANTED** as to Count III against CO Bard and CO Abrashoff.

## 2. Claims against PA Gillmen

Plaintiff also asserts that PA Gillmen acted with deliberate indifference to his medical needs based on his deficient response to his allegations of sexual assault. PA Gillmen, however, moves for summary judgment on the merits of this claim. (Doc. 143, at 9). Specifically, PA Gillmen argues that Plaintiff attempts to conflate his conduct with that of PA Capone, who is not a defendant to this action. (Doc. 143, at 9). Indeed, PA Gillmen notes that he saw Plaintiff on June 20, 2014 to follow up on PA Capone's report of rectal bleeding from June 18, 2014. (Doc. 143, at 4-6, 11).

Upon review of the record, PA Gillmen declares that he only had one interaction with Plaintiff around the time of the alleged sexual assault. (Doc. 143-3, at 2). During this June 20th visit, Plaintiff reported to PA Gillmen that he had noticed a small amount of red blood per rectum (as also reported to PA Capone) that had not occurred since. (Doc. 143-3,

at 2). PA Gillmen noted that Plaintiff moved around his cell without difficulty, was not in acute distress, and heard Plaintiff report that he was doing well and had no other problems to relay. (Doc. 143-3, at 2). PA Gillmen thus assessed that Plaintiff's medical issue had been resolved and did not require any treatment. (Doc. 143-3, at 2-3). PA Gillmen further affirms that he is not a mental health provider, and is not qualified to provided mental counseling to patients. (Doc. 143-3, at 5). However, Given the ongoing investigation into Plaintiff's sexual assault, PA Gillmen followed up with the supervising resident nurse who informed him that nothing further was needed or required at that time. (Doc. 143-3, at 2).

Given the record evidence presented, Plaintiff's claims against PA Gillmen do not survive summary judgment. Specifically, based on the facts and evidence presented, a reasonable juror could not find that PA Gillmen knew of and disregarded an excessive medical risk that existed when he saw Plaintiff on June 20, 2014. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Further, while PA Gillmen subsequently saw Plaintiff on July 23, 2014, it was not in connection with the reported sexual assault at SCI-Smithfield. (Doc. 143-3, at 3). Accordingly, there is no dispute of fact as to whether PA Gillmen acted with deliberate indifference towards Plaintiff's serious medical needs regarding his alleged rape.

Therefore, PA Gillmen's motion for summary judgment regarding the deliberate indifference to a serious medical needs claim asserted in Count III of the Amended Complaint is **GRANTED**.

### 3. Claims against the Supervisory Defendants

In Count VIII, Plaintiff alleges that Defendants Gavin and Vinansky (collectively, the "Supervisory Defendants"), were deliberately indifferent to his serious medical needs. (Doc. 68, at 48). Specifically, Plaintiff claims that the Supervisory Defendants knew of his

mental health diagnosis and "the violent terroristic practices of corrections officers and their ability to misuse medical records to prolong restraint of inmates needlessly." As such, Plaintiff asserts that the Supervisory Defendants violated his Eighth Amendment rights by depriving him of appropriately staffed therapeutic housing. (Doc. 68, at 48). The Corrections Defendants argue that they are entitled to summary judgment on the grounds that the Supervisory Defendants lacked personal involvement in connection with the alleged excessive use of force employed by the CO's at SCI-Waymart. (Doc. 133, at 17).

"[A] defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'" *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (internal citations omitted). Indeed, it is well settled that "civil rights claims cannot be premised on a theory of *respondeat superior*," as individual government defendants must have personal involvement in the alleged wrongdoing. *Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014). However, a prison official may be personally liable under § 1983 through two theories of supervisory liability: (1) if the official "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the constitutional harm;" or (2) "if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

Here, the Corrections Defendants argue that summary judgment is warranted because neither of the Supervisory Defendants were present at the time of the alleged September 5, 2014 beating and did not condone it. (Doc. 133, at 17). Moreover, the

Corrections Defendants only learned of the incident after the fact, and thus state that they could not have acquiesced in it. (Doc. 133, at 17). Based on the undisputed facts, the Court finds that granting summary judgment in the Supervisory Defendants' favor is appropriate in this case. Specifically, as Plaintiff advances his claims against the Supervisory Defendants under a deliberate indifference to a serious medical needs theory, the Corrections Defendants have sufficiently shown that the Supervisory Defendants were not personally involved in the medical treatment Plaintiff received while housed in the forensic treatment center at SCI-Waymart. Insofar as Plaintiff complains of the inadequate staffing at SCI-Waymart's forensic treatment center, which allegedly led to his injuries inflicted by Sgt. Martin, CO James, CO Broadhead and CO Strasburger, he does not sufficiently demonstrate that the Supervisory Defendants are personally liable based on any theory of supervisory liability.

Summary judgment is therefore **GRANTED** in the Supervisory Defendants favor regarding Count VIII of the Amended Complaint.

### 4. Claims against Sgt. Martin, CO Strasburger, CO James and CO Broadhead

In moving for summary judgment, the Corrections Defendants argue that there is no evidence that Sgt. Martin, CO Strasburger, CO James and CO Broadhead denied medical care to Plaintiff. (Doc. 133, at 23). However, the Corrections Defendants have neither provided any undisputed facts on the matter nor affirmatively come forward with any evidence to support this contention. By comparison, Plaintiff provides his declaration, wherein he states that Sgt. Martin, CO Strasburger, CO James and CO Broadhead beat him on the evening of September 5, 2014 for approximately five minutes. (Doc. 150-3, at 8). Thereafter, Plaintiff declares that Sgt. Martin, CO Strasburger, CO James and CO

Broadhead placed him in restraints for the next sixteen (16) to eighteen (18) hours, during which time a nurse did not see him. (Doc. 150-3, at 9). Simply stated, when construed in the light most favorable to Plaintiff as the non-moving party, the Corrections Defendants have not demonstrated that no dispute of material fact exists as to whether Sgt. Martin, CO Strasburger, CO James, and CO Broadhead denied Plaintiff medical care after the alleged beating they inflicted upon him. Accordingly, summary judgment is **DENIED** as to Count VIII in connection with Sgt. Martin, CO Strasburger, CO James and CO Broadhead.

E.  ADA CLAIMS – COUNTS XI AND XII

In addition to his constitutional claims, Plaintiff also brings claims against the DOC under the ADA and the RA. The Corrections Defendants argue that the DOC is entitled to summary judgment on these causes of action, as Plaintiff cannot establish that he was disabled under the ADA. (Doc. 133, at 24). The Corrections Defendants also assert that he was not denied any programming, services, and activity based on any purported disability. (Doc. 133, at 24). In opposing summary judgment, Plaintiff asserts that, instead of treating him, the DOC relegated him to the RHU where he was denied access to services. (Doc. 155, at 15-16).

The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). To establish a claim under Title II of the ADA,

a plaintiff must show "(1) that he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." Dahl v. Johnston, 598 F.App'x. 818, 819–20 (3d Cir.2015) (citing 42 U.S.C. § 12132); *see also* Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 553 n. 32 (3d Cir.2007). Further, The Third Circuit has held that "enforcing regulations [with respect to the ADA] require public entities to 'make reasonable modifications' to their programs and policies in order to avoid discrimination on the basis of disability." *Matthews v. Pa. Dept. of Corr.*, 613 F.App'x. 163, 167 (3d Cir. 2015) (citing 28 C.F.R. § 35.130(b)(7)).

Here, Plaintiff claims that it is uncontested that he is a person living with mental illness. (Doc. 155, at 14). He further points to his deposition, during which he testified that as an inmate with a mental health score of "D" he had the most severe classification of mental illness. (Doc. 155, at 16). Plaintiff also submits that he had behavioral challenges stemming from his ADHA and ADD. (Doc. 155, at 16). The Corrections Defendants, however, contend that merely suffering from a mental illness does not show disability under the ADA. (Doc. 133, at 25).

The Court is inclined to agree with the Corrections Defendants. Under the ADA, it is "'insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment.'" *Pritchett v. Ellers,* 324 F. App'x 157, 159 (3d Cir. 2009) (citing *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198 (2002)). Indeed, "[m]erely having an impairment does not make one disabled for the purpose of the ADA. Claimants also need to demonstrate that the impairment limits a major life

activity." *Toyota,* 534 U.S. at 195. "Major life activities" are "those activities that are of central importance to daily life." *Toyota,* 534 U.S. at 197.

Even if Plaintiff came forward with evidence that created a dispute of fact as to whether his mental condition substantially impaired a major life activity, there is no dispute of fact as to whether the DOC discriminated against him on the basis of said disability. Indeed, the record supports the Corrections Defendants Contention that he was placed in the RHU on the basis of his administrative custody status, and not due to a discriminatory animus against persons living with disabilities. Further, the Corrections Defendants assert that he still had access to psychiatric care while housed in the RHU at SCI-Smithfield. (Doc. 158, at 13). Therefore, no reasonable juror could find that Plaintiff was denied access to services, or otherwise discriminated against, on the basis of a perception of this disability.

Accordingly, summary judgement is **GRANTED** in the Corrections Defendants' favor as to Counts XI and XII against the DOC.

### F. State Law IIED Claims[6] – Count XIV

As a final matter, the Corrections Defendants, Defendant Fisher, and PA Gillmen respectively move for summary judgment of Plaintiff's state law IIED claims. (Doc. 133, at 26-29); (Doc. 138, at 8-14); (Doc. 143, at 13-14). Specifically, the Defendants assert that this intentional tort claim is barred on the basis of sovereign immunity, that Plaintiff has failed

---

[6] Notably, the Corrections Defendants do not appear to seek summary judgment as to Count XIII beyond argues that "the Court should . . . decline supplemental jurisdiction over any remaining state tort law claims, if all federal claims are dismissed." (Doc. 133, at 26). As discussed *supra,* several of Plaintiff's federal claims survive summary judgment. Accordingly, to the extent the Corrections Defendants seek summary judgment as to Plaintiff's state law Assault and Battery Claim against Sgt. Martin, CO Strasburger, CO James, and CO Broadhead asserted in Count XIII of the Amended Complaint, it is **DENIED**.

to provide a medical report in support of his claim, and that the alleged conduct does not rise to the requisite level of extreme behavior required under Pennsylvania law. (Doc. 133, at 26-29); (Doc. 138, at 8-14); (Doc. 143, at 13-14). Plaintiff opposes summary judgment on the ground that the Defendants have failed to come forward with any evidence that their conduct served a legitimate state purpose, as required to warrant the protection of sovereign immunity. (Doc. 155, at 13). Further, Plaintiff argues that Defendant Fisher's policy of shredding grievances at SCI-Smithfield, as well as the Supervisory Defendant's statements that effectively emboldened prison staff to beat inmates in the therapeutic mental health unit at SCI-Waymart, constituted sufficiently outrageous conduct to support an IIED claim. (Doc. 155, at 25-26).

Pennsylvania law provides that "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Cons. Stat. § 2310. Thus, sovereign immunity does not extend to state employees who are acting outside the scope of their official duties. *Cf. Kull v. Guisse*, 2013 WL 5762235, at *4 n. 5 (Pa. Commw. Ct. Oct. 16, 2013) ("[S]tate employees do not lose their sovereign immunity protection for intentional torts committed within the scope of their employment."). Regardless of the applicability of sovereign immunity, however, the Court finds that Plaintiff's intentional infliction of emotional distress claim fails as a matter of law. Specifically, Plaintiff has failed to provide competent proof that the alleged conduct resulted in physical injury accompanying his emotional distress.

Under Pennsylvania law, the elements of an IIED claim are as follows: "(1) the conduct [of the defendant] must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; [and] (4) that distress must be severe." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997). This also requires that a Plaintiff allege some type of harm, injury, or illness resulting from the distress. *Robinson v. Family Dollar, Inc.*, No. 14–3189, 2015 WL 3400836 (E.D. Pa. May 27, 2015) (citing *Corbett v. Morgenstern*, 934 F.Supp. 680, 684 (E.D. Pa. 1994)). Regarding this evidentiary requirement of injury in connection with emotional distress, a court within this district described:

> [T] he Pennsylvania courts have been clear that:
>
>> Given the advanced state of medical science, it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's "outrageousness" without expert medical confirmation that the plaintiff actually suffered the claimed distress. Moreover, the requirement of some objective proof of severe emotional distress will not present an unsurmountable obstacle to recovery. Those truly damaged should have little difficulty in procuring reliable testimony as to the nature and extent of their injuries. We therefore conclude that if section 46 of the Restatement is to be accepted in this Commonwealth, at the very least, existence of the alleged emotional distress must be supported by competent medical evidence.
>
> *Kazatsky v. King David Mem'l Park, Inc.*, 515 Pa. 183, 197, 527 A.2d 988, 995 (1987).

In light of this requirement of competent medical proof of physical injury to support an intentional infliction of emotional distress claim under Pennsylvania law, it has been held that:

> [The Pennsylvania] Supreme Court clearly articulated in *Kazatsky* that, to the extent the tort of IIED is recognized in this Commonwealth, recovery is limited to those cases in which competent medical evidence of emotional distress is presented by the claimant. *See also Cassell v. Lancaster Mennonite Conference*, 834 A.2d 1185, 1189 n.3 (Pa. Super. 2003) ("Expert medical testimony is necessary to establish that a plaintiff actually suffered the claimed emotional distress."); *Wecht v. PG Pub. Co.*, 725 A.2d 788, 791 (Pa. Super. 1999) ("The Court

[in *Kazatsky*] held that plaintiffs could not succeed absent medical confirmation that they actually suffered the claimed emotional distress."); *Shiner v. Moriarty*, 706 A.2d 1228, 1239 (Pa. Super. 1998) ("Expert medical testimony is required to establish a claim for intentional infliction of emotional distress."); *Britt v. Chestnut Hill College*, 429 Pa.Super. 263, 632 A.2d 557, 561 (1993) ("In addition to requiring that a plaintiff establish that the conduct complained of was outrageous, the Pennsylvania Supreme Court has required that the plaintiff present competent medical evidence to support the claim.").

*Gray v. Huntzinger*, 2016 PA Super 194, 147 A.3d 924, 929–30 (2016), *reargument denied* (Oct. 28, 2016), *appeal denied*, 168 A.3d 1238 (Pa. 2017).

*Landau v. Lamas*, No. 3:15-CV-1327, 2018 WL 8950141, at *10–11 (M.D. Pa. Oct. 10, 2018), *report and recommendation adopted in part, rejected in part on other grounds,* No. 3:15-CV-1327, 2019 WL 3521421 (M.D. Pa. Aug. 1, 2019).

In opposing summary judgment on these grounds, Plaintiff asserts that expert medical testimony of his emotional distress is not warranted here under the Pennsylvania rules of evidence. (Doc. 149, at 12). Further, based on the prison medical records provided, Plaintiff asserts that he has provided competent medical evidence of his related injuries. (Doc. 149, at 11-12). However, as noted by Defendant Fisher in his reply brief, Plaintiff cites to no expert medical testimony that speaks to the causal connection between his injuries stemming from his emotional distress and the Defendants' conduct. (Doc. 161, at 12). Accordingly, as Plaintiff has not come forward with evidence that meets the threshold of proof articulated in *Kazatsky*, his IIED claims fail as a matter of law. *See Landau*, 2018 WL 8950141, at *11.

Accordingly, summary judgment as to Plaintiff's state law IIED claim is **GRANTED** in favor of the Corrections Defendants, Defendant Fisher, and PA Gillmen.[7]

---

[7] The Court finds that summary judgment is also proper in favor of the Corrections Defendants and PA Gillmen, although they did not expressly move for summary judgment

### V. CONCLUSION

For the reasons stated herein, the Corrections Defendants motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Further, Defendant Fisher's motion for summary judgment and PA Gillmen's motion for summary judgment are **GRANTED**.

An appropriate Order follows.

BY THE COURT:

Dated: September 18, 2019

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

---

of Plaintiff's IIED claim on these grounds. *See Couden v. Duffy*, 446 F.3d 483, 507 (3d Cir. 2006) (affirming *sua sponte* grant of summary judgment when "[t]he grounds for granting summary judgment in favor of the moving defendants also applied to the claims against the non-moving defendant.").